MAURICE S. FITZGERALD *vs.* JOHN J. WILLIAMS.

Suffolk.   January 14, 1889. — February 26, 1889.

Present: MORTON, C. J., FIELD, C. ALLEN, HOLMES, & KNOWLTON, JJ.

*Evidence — Admission — Contradiction of Witness — Clergyman.*

At the trial of an action by a priest of the Roman Catholic Church against the archbishop of the diocese, for unlawfully removing him from his priestly office, on the issue whether the plaintiff had been guilty of misconduct in visiting a house of ill-fame for an improper purpose, he admitted having visited the place, but asserted that his visit was for a proper purpose, namely, to look after his nieces, of whom he was the moral protector. The defendant was then permitted to introduce the testimony of a witness to a conversation between the witness, the plaintiff, and one of his nieces, in which a charge of improper conduct by the plaintiff toward the niece was made by the witness, denied by the plaintiff, and reiterated by the niece. *Held,* that the evidence was not competent.

The plaintiff having testified that his first visit to the house was in the middle of September, 1888, without knowledge of its character, and for a proper purpose, the defendant was allowed to introduce the testimony of an inmate of the house that the plaintiff had visited it about five months previously, and had then and there had improper relations with her. *Held,* that the evidence was competent for the purpose of contradicting the plaintiff.

TORT by a priest of the Roman Catholic Church against the archbishop of the diocese of Boston, for unlawfully removing him from his priestly office, and for slander. Trial in the Superior Court, before *Aldrich,* J., who allowed a bill of exceptions, which, so far as material, was as follows.

The plaintiff testified that he was sent by the defendant to be pastor of St. Mary's Church, at Foxborough, and was there on September 24, 1883, on which date he received a note from the defendant, requesting him to call upon him, which he did on the afternoon of September 28 ; that the defendant then notified him that he had removed him from his place, and withdrawn his priestly faculties ; that the plaintiff demanded a specification of the charges against him, and that the defendant on that date, and again on October 1, 1883, refused to state what the charges were ; that, in consequence of this judgment by the defendant, he had been prevented from officiating as a priest, or from earning any remuneration for his services as such.

On cross-examination, the plaintiff testified, upon being asked

whether he ever went to a house of ill-fame on Hawkins Street in Boston, that he had done so on two occasions, first, about the middle of September, 1883, and again on October 1, 1883; that he went to the house the first time to make inquiries in consequence of information which he had received at a certain intelligence office; that he had four nieces, all but one of whom were minors, daughters of a deceased sister, of whom he had been the moral protector since their mother's death, several years before, and that in the summer of 1883 he made application to the Probate Court of this county to be appointed their guardian; that these nieces had left the house of his brother, who had taken care of them, and with whom they were residing, in August, 1883, without the knowledge either of his brother or himself, and had disappeared altogether for several months; that, immediately upon their disappearance, he applied to the police and other officials for assistance in finding them, and went to various places in Boston and elsewhere where he was informed or believed they might be; that in the course of this search he was told by a woman in an intelligence office that girls answering to the description of his nieces had gone to this house in Hawkins Street; that he visited the house to inquire as to the truth of this story without knowledge of the character of the house; and that on October 1, 1883, in consequence of the interview with the Archbishop, which indicated to him that there was a conspiracy against him, he went to this house, as he did to other places which he had recently visited, to obtain a certificate from the keeper of the house as to the nature of his first visit.

The plaintiff, upon further cross-examination, denied that one of his nieces had denounced him as having accomplished her ruin; or that one Kennedy had threatened to denounce him for seducing her.

The defendant testified that, by virtue of his office, under the laws and ordinances of the Roman Catholic Church, he had the power to remove priests from the churches of which they had charge, and to withdraw from them their priestly faculties for misconduct, without formal charge, or evidence, or hearing, such proceeding being known as an extra-judicial judgment; that he removed the plaintiff from his office as alleged, and withdrew his priestly faculties on September 28, 1883, and that upon that

day he informed the plaintiff orally that he had done so because he had learned that the plaintiff, on September 19, 1883, had visited a house of ill-fame in Boston, for improper purposes, stating to him that he had been seen by a person who followed him from the house to the South End; that the plaintiff thereupon admitted that this was the fact, and said that it was the only time it had happened; and that the plaintiff made no demand for a trial, and that the defendant accordingly made the removal aforesaid upon the plaintiff's confession.

The defendant, in addition to other witnesses called by him to prove that the plaintiff visited the house in question at the time stated for improper purposes, among whom were inmates of the house, called Mary Hart, who testified that she lived in that house from March, 1883, to May, 1883, and again in March, 1884, as a prostitute, but not from May, 1883, to March, 1884. The witness was then permitted, against the plaintiff's objection, to testify that she saw the plaintiff in that house about the middle of April, 1883, and that she then had improper relations with him.

The defendant also called as a witness one Kennedy, who was permitted to testify that he was counsel for the plaintiff's nieces at the hearing in the Probate Court on June 16, 1884, upon the plaintiff's petition to be appointed their guardian; that just before the hearing he had a conversation with the plaintiff, at which three of the nieces and the plaintiff's brother were present; that he told the plaintiff that he should be obliged to bring out in the hearing the fact that one of his nieces objected to his being appointed as such guardian on the ground that he had made improper advances towards her; that thereupon the niece who had accused the plaintiff made a remark with reference to such improper advances by the plaintiff. The witness was then asked, " What did the niece say? " to which the witness replied, " I made a statement, he denied it, and she reiterated it "; and to the further question, " What did she say? " he replied, " She said, you did take me out of my bed and take me into yours."

The plaintiff objected to the admission of the evidence of the witness Kennedy, but the judge admitted it, as bearing upon the truth of the plaintiff's testimony as given in his cross-

examination by the defendant, that the occasion of his visit
to the Hawkins Street house was in pursuance of his relation
as "moral protector" of the children. It did not appear when
this charge was made by the niece, or at what time the alleged
misconduct was charged to have taken place. The niece who
accused the plaintiff of improper conduct towards her testified,
on cross-examination, that she was in error when she accused
the plaintiff of seducing her; that she was then only about ten
or twelve years of age; that he had merely taken her from her
bed to his own, from which she immediately rose up and went
back to her bed, and that he made no improper proposals and
had no improper relations with her.

In his charge to the jury, the judge referred to this testimony
as follows : " There is one line of evidence in this case upon
which I desire to say a word in order that you shall give it
such significance as you have a right to, and no other, and
that is the evidence as to the relation between the plaintiff
and his niece or nieces. It is not one of the issues raised by
these pleadings, as to whether he was guilty of improper con-
duct towards his niece or not; but when he said, as an explana-
tion of the cause of his going to the house on Hawkins Street,
said to be a house of ill repute, that he was then and there in
search of his nieces or niece, it seemed to me that it was proper
for the defendant to introduce evidence as to the relations be-
tween the plaintiff and his nieces, he using, as you will re-
member, the words, that, although he was not their legal, he
regarded himself as their moral guardian, and these young girls
having left the house in which they had been living, he, as
their relative and moral guardian, looking after their welfare,
was in search of them, and, upon some information that he had
received from some source, went to this house to make an inquiry
in the progress of that search, and that was the whole reason of
his going to the house the first time. Now, the only importance
that you can attach or ought to attach to this evidence is, that
it tends to show that his relations with his nieces were of such a
character as to render it improbable that he was pursuing them
or searching for them for any such purpose as he states. You
have a right to consider it as bearing upon the question of his
explanation or excuse, the argument being, that if he was really

their destroyer, and not their moral and priestly guardian, looking after the purity of their lives, he was their seducer, and that then he would not be likely to be visiting such a place as that in search of them, and that the explanation fails. Now, what significance or value or force there is to this evidence it is for you to say, and not for me to intimate in any manner whatsoever, but it was introduced for that purpose, and for nothing else, and you will not extend the influence of it, whatever it may be, beyond that point."

The judge also instructed the jury, that, if they should find, upon all the evidence, either that the plaintiff confessed that the charge as made against him by the defendant was true, and that on that ground the defendant removed him, — or that if no confession was made, yet, if the charge as made by the defendant had been proved by the evidence in the case, — if the jury should also find that the archbishop, in conformity with the laws of his church, had the right to pronounce judgment of removal upon an oral charge, and without other proceedings, as he had done in this case, the defendant would be entitled to a verdict.

The jury returned a verdict for the defendant; and the plaintiff alleged exceptions.

*R. M. Morse, Jr.,* (*M. Morton, Jr.,* with him,) for the plaintiff.

*W. Gaston & C. F. Paige,* (*F. E. Snow* with them,) for the defendant.

C. ALLEN, J. The defendant testified that he had the power to remove priests for misconduct, and he assumed the burden of showing misconduct on the part of the plaintiff. It thus became a material question whether the plaintiff had been guilty of misconduct in visiting the house of ill-fame for an improper purpose. The plaintiff admitted that he had been there, but asserted that his visit was for a proper purpose, namely, to look after his nieces, of whom he was the moral protector. The defendant thereupon sought to show that he was not then acting as their moral protector, that his testimony in this respect was untrue, and that he had been guilty of improper conduct towards one of his nieces. In order to show this, he was allowed to put in the testimony of a witness, Kennedy, to a conversation in June, 1884, which was long after the misconduct charged upon

the plaintiff, at which the plaintiff, three of the nieces, the witness Kennedy, and one other person were present, in which one of the nieces said that the plaintiff took her out of her bed and into his own. This being merely a declaration by her to him, it would be competent in evidence only on the ground that there was an admission by him of its truth. But the witness testified that the plaintiff denied it. He said, " I made a statement, he denied it, and she reiterated it." His denial must be considered as going to the truth of the statement made by both. Now, assuming that it was open to the defendant to show that the relations of the plaintiff to his nieces was not that of their moral protector, this method of showing the fact was not competent, because there was no admission by the plaintiff of the fact charged. *Commonwealth* v. *Kenney,* 12 Met. 235. This testimony would apparently injure the plaintiff's case, and because of its admission we feel constrained to grant a new trial.

It is true, the plaintiff on cross-examination had denied that one of his nieces had denounced him as having accomplished her ruin, or that Kennedy had threatened to denounce him for having seduced her; but this was a collateral matter, and it was not competent to introduce the testimony merely for the purpose of contradicting that denial, nor has its competency been urged on that ground.

The testimony of the witness Hart to the plaintiff's acts in the same house of ill-fame five months before the misconduct charged upon him by the defendant was competent. The plaintiff had testified that his first visit to that house was about the middle of September, 1883, and that he went there without knowledge of the character of the house, and for an innocent purpose. Upon these material matters, the testimony of Hart had a tendency to contradict him; and in these aspects it was certainly competent. We need not go further, and consider whether in a case of this kind the testimony was not competent on more general grounds, as tending to show other misconduct, unfitting the plaintiff for his priestly office, of the same kind and at the same place specified by the defendant, though not upon the same day.

*Exceptions sustained.*