# CASES DETERMINED

BY THE

# SUPREME COURT

OF THE

# STATE OF MISSOURI

AT THE

## APRIL TERM, 1896.

---

THE STATE v. TAYLOR et al., *Appellants.*

### Division Two, April 21, 1896.

1. **Criminal Law:** PRACTICE: APPEAL: EXCEPTIONS: ATTORNEYS, RULE UPON. The action of the trial court on a motion for a rule on attorneys to show by what authority they appear for the state in a criminal prosecution is a matter of exception and can only be saved for review in the appellate court by being preserved in the bill of exceptions.

2. **Practice:** BILL OF EXCEPTIONS. An exception taken at one term, but not then preserved, can not be saved by incorporating it into a bill of exceptions taken at a subsequent term.

3. **Criminal Law:** PRACTICE: PREJUDICE OF OFFICER SUMMONING JURY: DUTY OF ATTORNEY: APPELLATE PRACTICE. Where an attorney for the defendant in a criminal trial hears expressions indicative of prejudice against his client by an officer charged with the summoning of jurors and fails to bring it to the attention of the court by a proper method of procedure, the matter will not be reviewed by the appellate court.

(109)

State v. Taylor.

4. ———: ———: ———: CONFLICTING AFFIDAVITS: APPELLATE PRAC-
TICE.   Where there are conflicting affidavits as to the prejudice of an
officer charged with summoning jurors, the appellate court will defer
to the ruling of the trial court upon them.

5. ———: ———: JUROR, QUALIFICATION OF.   One who has read the
evidence taken before the coroner in a case of homicide, either as
originally written or as printed in a newspaper, or who has read the
evidence on preliminary examination in a criminal cause and formed
an opinion therefrom, is, in either case, as a matter of law, disquali-
fied from serving as a juror in the trial of such cause.   Affirming,
*State v. Robinson,* 117 Mo. 649, and other cases.

6. ———: ———: COMPETENCY OF JUROR, EXCLUSION OF EVIDENCE AS
TO: APPELLATE PRACTICE.   Where the trial court excluded evidence
on the question of the competency of jurors, but stated that he
would hear counsel on that point later, and the offer of the evidence
was not renewed, the matter will not be reviewed upon appeal.

7. Practice: APPEAL: ERROR.   In order to convict the lower court of
error, such error must be affirmatively shown or must appear by nec-
essary implication.

8. Criminal Law: PRACTICE: DISQUALIFICATION OF JUROR: READING
EVIDENCE OF FORMER TRIAL.   The reading of fragmentary portions of
the evidence on a former criminal trial and the forming of an opin-
ion thereon will not disqualify a juror; in order to his disqualifica-
tion he must have read all of such evidence.

9. ———: ———: EXCUSING JUROR: DOMICILE.   It was not error to
excuse a juror who had been absent from the state two years with the
intention of changing his domicile, where it did not appear that he
had returned with the intention of remaining.

10. ———: ———: ———.   A court may, of its own motion, examine
venire men and excuse them, although not challenged by either party,
and its discretion in such matter will not be disturbed where abuse
is not shown.

11. ———: ———: DISQUALIFICATION OF JURORS.   The testimony of
jurors that they have formed opinions as to defendant's guilt from
reading newspaper reports will not disqualify them, where it appears
from their entire *voir dire* examination that such alleged opinions
were mere impressions.

12. ———: ———: JURORS, CHALLENGE OF.   Challenges of jurors for
cause, to be available, must state the particular cause of challenge; a
mere general objection is not sufficient.

13. ———: ———: ———.   A challenge to the array was, by the com-
mon law, required to be in writing, and this is the rule where the
common law has not been abrogated by statute.

State v. Taylor.

14. ———: ———: ———. If a challenge be first made to the polls, it can not afterward be made to the array.

15. ———: ———: TIME OF CHALLENGING JURORS: EX POST FACTO LAW. The act of March 9, 1895 (Laws, 1895, p. 165) changing the time allowed defendants in which to make challenges to jurors in capital cases from forty-eight hours, as theretofore given (R. S. 1889, sec. 4204), to twenty-four hours, is not obnoxious to the constitution of the state or of the United States as being an *ex post facto* law; such change is merely one of procedure and the act is applicable in the trial of crimes committed before its enactment.

16. ———: ———: THREATS: ADMISSIONS. Where a defendant does not in his testimony deny making threats testified to by the state's witnesses, he will be held to admit having made them.

17. ———: ———: INSTRUCTION. Error in instructing that defendant and his wife are competent witnesses, but the fact that he is the defendant and she is his wife and their interest in the result of the trial may be considered by the jury in determining the weight, *if any*, to be given their testimony, will not constitute ground of reversal, where the court instructed the jury that defendant was a competent witness in his own behalf, that his evidence could not be disregarded because he was the defendant on trial, that the law presumed him innocent and that his testimony should be fairly and impartially weighed and considered together with all the other testimony in the case.

18. ———: ———: ———. An instruction on a trial for murder, that the jury would be warranted in finding the defendants guilty if they believe that they "or either of them, the other being present," feloniously, etc., did kill the deceased, is not objectionable, upon the ground that it required a conviction of both defendants, if a conviction of one was had.

19. ———: ———: ———: CONSENTING TO COMMISSION OF CRIME. An instruction on a trial for murder, authorizing a verdict of guilty if the jury believed beyond a reasonable doubt that both defendants "or either of them, the other being present, aiding, abetting, or consenting thereto" did feloniously, etc., kill the deceased, is erroneous in warranting a conviction of one defendant if he was present and *consenting* to the perpetration of the crime, but where the evidence shows that if present, he did more than consent, the error is not ground for reversal.

20. ———: ———: ———: APPEAL. A judgment in a criminal case should not be reversed on appeal for any defect or imperfection which does not tend to the prejudice of the substantial rights of the defendant on the merits. R. S. 1889, sec. 4115.

State v. Taylor.

21. ——: ——: ——: ALIBI. An instruction on a criminal trial that the prosecution is required to "prove the defendant's guilt beyond a reasonable doubt, but it does not require the defendants to prove an alibi beyond a reasonable doubt. Although the evidence of an alibi falls short of the weight of moral certainty as to the existence of the alibi, yet, if it leaves in the minds of the jury such a doubt or uncertainty that, if taken by itself, they could not find for the alibi or against the alibi, then the jury must carry such doubt into the case of the prosecution, and array it there as an element of the reasonable doubt beyond which the prosecution must establish guilt. The defendants are entitled as much to the benefit of such doubt as any other doubt raised by the evidence; and if its weight alone, or added to the weight of any other, be sufficient to raise a reasonable doubt as to the defendant's guilt, then the jury must acquit them," is sufficient as to the meaning of the term "alibi" as applied to the facts in evidence.

22. ——: ——: ——: REASONABLE DOUBT. An instruction in a criminal cause to the effect that if any one of the jury, after having duly considered all the evidence and consulted with his fellow jurymen, has a reasonable doubt of defendant's guilt they should find him not guilty is improper. A reasonable doubt, to entitle a defendant to an acquittal, should be entertained by the jury as a body.

23. ——: ——: EVIDENCE: SELF-SERVING ACTS. Evidence that defendants in a criminal cause, when arrested in another state, were willing to return is irrelevant, and also inadmissible, as being of a self-serving character.

24. ——: ——: ——: CONTRADICTION AS TO IRRELEVANT MATTERS. A witness can not be impeached by proof of contradictory statements as to matters not relevant to the issue on trial.

25. ——: ——: ——: CONTRADICTORY STATEMENTS: CORROBORATION. Where the motive of a witness testifying in a criminal cause is not attacked, her testimony at the coroner's inquest is not admissible to corroborate her, when attacked by proof of contradictory statements by her.

26. ——: ——: ——: CROSS-EXAMINATION. Where a defendant on trial for murder testified on his examination in chief that he had a wife and three children and remained at his office on the night of the murder until 10 o'clock and spent the remainder of the night at home, the proper foundation was laid for asking him on cross-examination with whom he stayed on the night of the murder.

27. ——: ——: ——: CROSS-INTERROGATORIES: CROSS-EXAMINATION. While the admission of the cross-examination of a witness, where no cross-interrogatories were attached to the special commission to take her deposition, is technical error, it will not constitute ground for the reversal of the judgment.

28. ———: ———: ———: CROSS-EXAMINATION. Where a witness denies portions of his testimony taken at a former trial, only such portions should be read for the purpose of impeaching him, but the reading of the whole is not such error as will demand a reversal of the judgment.

29. ———: ———: IMPROPER REMARKS OF COUNSEL. Misconduct of the prosecuting attorney in calling the attention of the jury, in his argument, to the failure of the defendant's wife to testify, will not constitute reversible error, where the court immediately rebuked him and admonished him to keep within the record and argue the case in a proper manner.

30. ———: ——— : ———. Remarks of counsel for the state, referring to one of defendants' counsel, that: "He is a good man, and I know he has influence with juries, but * * * he may be wrong. He throws his eyes heavenward and tells you, gentleman, that he believes these defendants are not guilty, But, gentlemen, with the same solemn look, with the nervous twitches of the muscles of his face, this great pleader has looked heavenward in about nine or ten other murder cases, and exclaimed in impressive tones, 'My client is not guilty,'" do not call for a reversal of the judgment, although unrebuked by the court.

31. ———: ———: ———. The statement of counsel for the prosecution in argument that he was acting in the case without pay, as a duty to the people, does not constitute error, even though unrebuked by the court, on objection by defendants' counsel.

32. ———: ———: ———. Reference by counsel for the state, in argument, to the fact that one of the defendants and the deceased had been jointly indicted, was proper, where it was shown by the evidence that such defendant and the deceased had been jointly indicted for an offense in another county, for which deceased had been sentenced to the penitentiary and had been pardoned that he might testify against his codefendant on the trial for the same offense and that both defendants knew deceased had been pardoned for that purpose and had made threats against him.

33. ———: ———: ———: BILL OF EXCEPTIONS. The point that certain remarks of counsel for the state were prejudicial, as reflecting upon counsel for defendant, will not be regarded upon appeal, where it is not shown by the record that such complaining counsel appeared for the defendant in the trial; the statement in the motion for new trial that such counsel appeared for defendant and that the remarks of counsel for the state were an insinuation that he had been guilty of bribery or attempted bribery do not make them a part of the record, as statements in motions for new trial do not prove themselves.

34. ———: ———: ———. Remarks of prosecuting counsel reflecting discreditably upon counsel for defendant will not be ground of reversal where the court rebukes offending counsel and directs him to avoid vituperation.

35. ———: ———: MISCONDUCT OF JURY. The fact that the sheriff allowed the jurors in a prosecution for murder to stop on the way to their room and be photographed does not constitute available error upon appeal.

36. ———: ———: ———: INTOXICATING LIQUOR. The purchase and drinking of a small quantity of beer by the jury during a trial for murder is not ground for reversal of the judgment upon appeal, it not appearing that they were in any way influenced by it.

37. ———: ———: ———: CARD PLAYING. The playing of a game of cards by the jury during a murder trial, it not appearing at what stage of the trial the game was played, is not reversible error.

38. ———: ———: ———: FINDING OF TRIAL COURT: APPEAL. The finding of the trial court, upon affidavits pro and con, as to the alleged separation and misconduct of the jury and the previous formation and expression of opinion by some of them, will not be disturbed upon appeal, except for reasons the most clear and manifest.

39. ———: ———: AFFIDAVITS ON MOTION FOR NEW TRIAL: DISCRETION OF TRIAL COURT. The discretion of the trial court in refusing time to defendants to secure affidavits in rebuttal of those filed by the state rebutting defendants' affidavits in support of the motion will not be disturbed, where no abuse of such discretion is shown.

*Appeal from Carroll Circuit Court.*—HON. W. W. RUCKER, Judge.

AFFIRMED.

*D. M. Wilson, Ralph F. Lozier, J. B. Hale,* and *Virgil Conkling* for appellants.

(1) Every juror who had formed an opinion on the issue from reading in the *Democrat* the literal or substantial testimony of the former trial was incompetent and totally disqualified under the law of Missouri. Const. of Mo., art. 2, sec. 22; Const. U. S., 6th amendment; R. S. 1889, sec. 4197; *State v. Culler,* 82 Mo. 623; *State v. Hopkirk,* 84 Mo. 283; *State v. Wilson,*

85 Mo. 140; *State v. Hultz*, 106 Mo. 53; *State v. Robinson*, 117 Mo. 649; *State v. Bryant*, 93 Mo. 273, separate opinion of Judge SHERWOOD. (2) Martin M. Dyer was competent as a juror, although having lived in the county and state only six months. It was error to refuse to accept him on the panel. R. S. 1889, sec. 6060; *State v. France*, 76 Mo. 681; *State v. Fairlamb*, 121 Mo. 137. At the time the juror was excused, prompt objection was made and exception saved and objection renewed in motion for new trial and accompanied by affidavit showing qualification of juror. *State v. Ward*, 74 Mo. 253; *State v. Jackson*, 96 Mo. 200. (3) After the commission of the offense, no amendment of the statute could legally deprive defendants of their preexisting right to forty-eight hours for challenges. In ruling otherwise, error was committed by the trial court. R. S. 1889, sec. 4204. The act of March 9, 1895 (Laws, p. 165), is inoperative as to this case. *State v. Grant*, 79 Mo. 113. "No bill of attainder or *ex post facto* law shall be passed." Const. U. S., art. 1, secs. 9, 10; Const. of Mo., art. 2, sec. 15; *Kring v. Missouri*, 107 U. S. 506; *Ex parte Medley*, 134 U. S. 160; *State v. Fairlamb*, 121 Mo. 151. (4) The court erred in admitting the cross-examination of Mrs. Edward Fowler, no cross-interrogatories having been attached to the special commission under which her deposition was taken. R. S. 1889, secs. 4147, 4148, 4449, 4450, 4451, 4452; *Shepherd v. Railroad*, 85 Mo. 629. (5) The state was not entitled to read in evidence the entire testimony of John Hoke at the former trial. Only such portion was competent as related to the matter upon which he was being contradicted by the defense. Starkie on Ev., p. 214; Taylor on Ev., sec. 1445; Wharton on Ev., sec. 483; *State v. Cooper*, 83 Mo. 698. (6) The trial court erred in excluding the depositions of L. D. Gleason and wife, which were in legal form and immediately

connected with the subject of the inquiry.   Starkie on Ev. [9 Ed.], 203; 1 Thompson on Trials, sec. 469; Rice on Criminal Ev., secs. 221, 232; *Schuster v. State*, 80 Wis. 107; *Com. v. Hunt*, 4 Gray (Mass.), 421; *Seller v. Jenkins*, 97 Ind. 430; *Atty-Gen. v. Hitchcock*, 1 Exch. 91; *State v. Jaeger*, 66 Mo. 180; *State v. Thomas*, 78 Mo. 343.   (7)   The testimony of Mrs. David Gibson before the coroner's jury, offered after evidence by the state of her contradictory statements, was competent to confirm and corroborate her testimony on the trial, and was erroneously excluded.   Rice on Criminal Ev., secs. 86, 233; *State v. Grant*, 79 Mo. 133; *State v. Whelehon*, 102 Mo. 21; *State v. Patrick*, 107 Mo. 155.  (8) The cross-examination of defendant, Wm. P. Taylor, violated both the spirit and the letter of the statute.   R. S. 1889, sec. 4218; *State v. Turner*, 110 Mo. 196.   (9)   Instructions 1 and 3, given for the state, were erroneous in requiring the conviction, if one was had, to include both defendants.   It was competent for the jury to convict one and acquit the other, and they should have been so instructed.   1 Bishop's New Criminal Law, sec. 800; 1 Bishops New Crim. Proc., secs. 472, 1036, 1037; *State v. Rambo*, 95 Mo. 465; *State v. Kaiser*, 124 Mo. 651. (10)   Instruction number 6, given for the state, was erroneous.   It virtually directs the jury to ignore the defendants' testimony, thereby depriving them of the benefit of the statute which makes them competent witnesses, and is clearly a comment upon the evidence. R. S. 1889, secs. 4218, 4220; *State v. Maguire*, 69 Mo. 202; *State v. Zorn*, 71 Mo. 416; *State v. Cook*, 84 Mo. 46; *State v. Young*, 99 Mo. 676; *State v. Brown*, 104 Mo. 374; *State v. Ihrig*, 106 Mo. 270; *State v. Renfrow*, 111 Mo. 596; *State v. Lingle*, 128 Mo. 538. (11) The court erred in failing to give an instruction upon alibi defining the term and applying it to the facts in evidence in this case.   R. S. 1889, sec. 4208; *State v.*

*Branstetter*, 65 Mo. 155; *State v. Banks*, 73 Mo. 592; *State v. Palmer*, 88 Mo. 568; *State v. Maguire*, 113 Mo. 675; *State v. Umble*, 115 Mo. 463; *State v. Taylor*, 118 Mo. 180. (12) The argument of state's counsel exceeded the bounds of legitimate discussion and was grossly improper. It constitutes reversible error. *State v. Lee*, 66 Mo. 165; *State v. Jackson*, 95 Mo. 623; *State v. Young*, 99 Mo. 683; *State v. Ulrich*, 110 Mo. 350; *State v. Warford*, 106 Mo. 65; *State v. Woolard*, 111 Mo. 248; *State v. Bobbst*, 131 Mo. 328. (13) The argument of prosecuting attorney Miller was a ruthless and wanton violation of the statute. It was inexcusable, intensely prejudicial, and constituted error in its most virulent form. R. S. 1889, sec. 4219; *State v. Martin*, 74 Mo. 547; *State v. Fairlamb*, 121 Mo. 150; *State v. Brownfield*, 15 Mo. App. 593; *State v. Leabo*, 89 Mo. 257; *Johnson v. State*, 63 Miss. 313; *Raddick v. State*, 16 So. Rep. (Miss.) 490; *Hunt v. State*, 12 S. W. Rep. 737; *Johnson v. State*, 20 S. W. Rep. (Tex.) 490; *Wilkins v. State*, 26 S. W. Rep. (Tex.) 409; *Brazell v. State*, 26 S. W. Rep. (Tex.) 727; *People v. Brown*, 53 Cal. 66; *Baker v. People*, 105 Ill. 452; *Quinn v. People*, 123 Ill. 333; *Showalter v. State*, 84 Ind. 562; *Coleman v. State*, 111 Ind. 563; *State v. Tennison*, 42 Kan. 330; *State v. Banks*, 7 Atl. Rep. (Me.) 269; *Com. v. Worcester*, 141 Mass. 58; *Staples v. State*, 14 S. W. Rep. (Tenn.) 603. (14) The beer drinking, card playing and courting of notoriety, in which the jury indulged, was alone sufficient to attaint and vitiate the verdict and require its utter rejection. *State v. West*, 69 Mo. 405; *State v. Baldy*, 17 Iowa, 39; *Ryan v. Harrow*, 27 Iowa, 494; *Jones v. State*, 13 Tex. 168. (15) In refusing to defendants any reasonable time to secure rebuttal affidavits in support of the motion for new trial, the trial court abused the discretion in it vested, and committed manifest error. "If affidavits can

not be prepared in time for the hearing, the proper procedure is to ask for further time, which will usually be granted where good reasons appear therefor." 2 Thompson on Trials, sec. 2760. *Howland v. Reeves*, 25 Mo. App. 463. The discretion of the trial court in refusing a continuance is reviewable upon appeal, and the judgment will be reversed if the continuance was improperly refused. *State v. Maddox*, 117 Mo. 681; *State v. Newsum*, 129 Mo. 154.

*R. F. Walker*, attorney general, *Morton Jourdan*, assistant attorney general, *T. M. Bresnehan*, prosecuting attorney, *J. L. Minnis*, *E. B. Fields*, *L. A. Holliday*, *B. F. Pierce*, and *Sidney Miller* for the state.

(1) The defendants did not preserve their exceptions to the action of the court in overruling their motion for a rule on certain attorneys for the state to show by what authority they appeared in the case. These exceptions should have been preserved at the term at which they were taken, and could not be saved by incorporating them into a bill at a subsequent term. R. S. 1889, secs. 2168, 4221. It is the universal practice in this state for attorneys to be employed to assist in criminal prosecutions, both in the trial and appellate courts. *State v. Duncan*, 116 Mo. 307. The fact that these attorneys may have been employed by persons living in the community where the killing occurred, did not render it improper. *State v. Sweeney*, 93 Mo. 42. The action of the court in permitting them to assist was equivalent to an appointment. *State v. Griffin*, 87 Mo. 608. (2) The failure of R. F. Lozier, one of defendants' counsel, who was cognizant of alleged expressions of prejudice against defendants, by one of the officers charged with summoning jurors, to properly bring the matter before the court, was a waiver of their right to have it reviewed on appeal. *State v. Smith*,

114 Mo. 406; *State v. Sansone*, 116 Mo. 1. The facts stated by Mr. Lozier were controverted and the trial court heard affidavits *pro* and *con*, and its finding and conclusions will not be disturbed by this court, unless the discretion exercised has been abused, and that to the prejudice of the defendants. *State v. Howell*, 117 Mo. 342; *State v. Howard*, 118 Mo. 136. (3) The court committed no error in excusing Dyer from the venire of three hundred. He was not at the time a citizen of Missouri. (4) The instructions given for the state correctly declare the law. They were exceedingly liberal to the defendants, and present clearly all the issues made by the indictment and the testimony. The twelve instructions given for the defendants were more liberal than was warranted by the law or the testimony. The court properly gave no instruction for murder in the second degree. There was no evidence upon which to base it. *State v. Kloss*, 117 Mo. 591; *State v. Brown*, 119 Mo. 527. (5) This court will not reverse a judgment because of the insufficiency of the testimony, except where there is a total failure of proof. *State v. Fisher*, 124 Mo. 462; *State v. Punshon*, 124 Mo. 448; *State v. Young*, 119 Mo. 495; *State v. Banks*, 118 Mo. 117. The testimony in this case shows the guilt of both defendants beyond a reasonable doubt. (6) The alleged error of improper remarks of counsel has no foundation in fact. They were either harmless or were properly rebuked by the court. Where the court properly rebukes and reprimands a prosecuting officer who uses improper language in argument, the appellate court will not interfere and reverse a judgment. *State v. Brandenberger*, 118 Mo. 187; *State v. Howard*, 118 Mo. 145; *State v. Graves*, 95 Mo. 516; *State v. Dusenberry*, 112 Mo. 277; *State v. Fitzgerald*, 130 Mo. 407. (7) The court did not err in requiring defendants to announce their challenges in less than forty-eight hours after the

list of forty jurors was delivered to them. The act of 1895 (Laws, p. 165) only allowed them twenty-four hours. The enactment of this law after the commission of the crime, only affected the procedure, and it is not an *ex post facto* law, or retrospective in its operation. *Ex parte Bethurum*, 66 Mo. 547; *State v. Johnson*, 81 Mo. 62; *O'Bryan v. Allen*, 108 Mo. 230; Cooley, Const. Lim. [6 Ed.], pp. 319–326; *Kring v. Missouri*, 107 U. S. 224; *Downing v. State*, 13 Miss. 664; *Gut v. State*, 9 Wall. 35; *Stokes v. People*, 53 N. Y. 164; Bishop's New Cr. Proc., sec. 98; *State v. Dolan*, 93 Mo. 472. (8) No error was committed in the admission or rejection of evidence. (9) The cross-examination of the two defendants was entirely proper and legitimate, and was in accord with the now well established rule in this state, which, announced in the case of *State v. Avery*, 113 Mo. 499, has been followed and reaffirmed in the cases of *State v. Kennade*, 121 Mo. 405; *State v. Fitzgerald*, 130 Mo. 407; *State v. Wisdom*, 119 Mo. 530. (10) Affidavits were filed *pro* and *con* as to the alleged misconduct of the jury and the finding of the court as to the fact will not be disturbed in this court. *State v. Howard*, 118 Mo. 136; *State v. Howell*, 117 Mo. 342; *State v. Nocton*, 121 Mo. 537; *State v. Gonce*, 87 Mo. 627; *State v. Cook*, 84 Mo. 40. (11) Even if some of the jurors drank a small quantity of beer, it will not cause a reversal of the judgment in the absence of proof that they were affected by it. *State v. Baber*, 74 Mo. 292; *State v. West*, 69 Mo. 401; *State v. Upton*, 20 Mo. 398. (12) The fact that the jury stopped for a moment and allowed a snap-shot picture to be taken of them, could in no way have prejudiced defendants. (13) The exclusion of evidence as to the competency of jurors, and the statement of the court that it would hear evidence on that point later, will not constitute error, where no offer of the evidence was afterward

made. (14) The court very properly denied the challenge of the defendants made to the entire array; they had already interposed their challenge to the individuals on the panel, and had saved their exceptions to the individual jurymen; defendants can not afterward object to the whole panel. *State v. Clark*, 121 Mo. 513. (15) Where the trial court has passed on affidavits *pro* and *con* as to alleged expressions of opinion by jurors, its finding will not be disturbed on appeal, especially where the proof is overwhelming that they had formed or expressed no opinions. *State v. Howard*, 118 Mo. 136; *State v. Howell*, 117 Mo. 342; *State v. Gonce*, 87 Mo. 627; *State v. Cook*, 84 Mo. 40. (16) The rule in this state, as announced in the recent expressions of this court, that the formation of an opinion by a juror from newspaper reports and rumors as to the guilt or innocence of the accused, which would require evidence to remove that opinion, does not render the juror incompetent, provided the court (trial) is satisfied that the opinion which the juror entertains would readily yield to the testimony in the case, and that the juror is in condition of mind to pass upon the issues under the evidence free from bias. *State v. Punshon*, 133 Mo. 44; *State v. Duffy*, 124 Mo. 1; *State v. Williamson*, 106 Mo. 169; *State v. Elkins*, 101 Mo. 349; *State v. Cunningham*, 100 Mo. 386; *State v. Bryant*, 93 Mo. 273; *State v. Brooks*, 92 Mo. 542; *State v. Hopkirk*, 84 Mo. 283; *State v. Stein*, 79 Mo. 330; *State v. Walton*, 74 Mo. 275; *State v. Barton*, 71 Mo. 288; *State v. Brown*, 71 Mo. 454; *State v. Core*, 70 Mo. 491; *State v. Rose*, 32 Mo. 346; *State v. Davis*, 29 Mo. 397; *State v. Baldwin*, 12 Mo. 223; *Spies v. The People*, 122 Ill. 1; *Stokes v. People*, 53 N. Y. 171; *Wilson v. People*, 94 Ill. 299; *Ashton v. State*, 31 Tex. Cr. Rep. 479; *Reed v. State*, 32 Tex. Cr. Rep. 25; *Shawnon v. State*, 26 S. W. Rep. 410; *State v. Covington*, 13 So. Rep. 266; *State v. Church*

60 N. W. Rep. (S. D.) 143; *State v. Sawtell*, 32 Atl. Rep. (N. H.) 381.

SHERWOOD, J.—The defendants have appealed to this court, having been adjudged guilty of murder in the first degree.   The indictment charges the crime to have been committed with a pistol, on the body of one Gus. Meeks, in Linn county, on the tenth day of May, 1894.

As will be inferred from the place of trial the venue was changed to Carroll county on application of defendants, the basis of their application being the alleged prejudice against them of the inhabitants of the counties of Linn, Sullivan, and Chariton.

As preliminary to disclosing a sufficient portion of the evidence to a proper understanding of this cause, it becomes necessary to set forth the prominent features of the region of country where the occurrences to be presently related took place.

Milan is the county seat of Sullivan county, it is situate on the Burlington & Kansas City railroad some twelve miles by rail and fourteen miles by wagon road in nearly a north course from Browning, a town on the south border of Linn county.   Cora is a village on the same railroad, about midway between Browning and Milan.   At Browning defendant William P. (commonly called "Bill") Taylor lived, being a lawyer and cashier of the People's Exchange Bank at that place. Defendant George Taylor lived on a farm four and one half miles southeast of Browning.   The road leading from that place to Milan goes east until the outskirts of the former town are reached, when it turns north toward Milan.   At the point where the road thus turns toward Milan, another road, also a continuation of the road from Browning, continues in a southeasterly course until it reaches the farm of George E. Taylor.   At Milan

lived Mrs. Martha J. Meeks, the mother of the murdered man. She had lived there since October, 1893, with her daughter-in-law, the wife of Gus Meeks, and their three small children. The scene of the murder was on Jenkins hill a point in Linn county and on the road leading to defendant George E. Taylor's farm and about one and one half miles from the latter, and about two miles southeast of Browning.

This statement is sufficiently explanatory of the situation and surroundings to allow the evidence adduced at the final trial to be readily understood. A mistrial had occurred at the March term, 1895, of the Carroll circuit court, and the final trial of the cause occurred at the July term of that year.

Proceeding now to give the substantial portions of what the record discloses, it appears that the defendants were intimate associates of Gus Meeks; that Bill Taylor and Gus Meeks had prior to May 10, 1894, been jointly indicted by the grand jury of Sullivan county for stealing cattle. To this charge Meeks pleaded guilty and was sentened to the penitentiary; but at the same term Bill Taylor's case was continued. Meanwhile Bill Taylor had been charged in his home county with the crime of arson, and was indicted for that crime by the grand jury of Linn county, and before his departure for Jefferson City Meeks was taken to Linneus and testified against Bill Taylor in the arson case. Taken afterward to the penitentiary, Meeks was pardoned out by the governor in April, 1894, in order that he might return to Sullivan county and testify against Bill Taylor.

Meeks arrived at Milan on Monday, the seventh of April, where his mother, wife, and three little daughters were then living together. Shortly after Meeks's return Bill Taylor, seemingly cognizant of the object of that return, made frequent threats against Meeks.

On the Monday or Tuesday next preceding the murder, which occurred, it seems, on Friday, when speaking to Burdett, who occupied a blacksmith shop just east of and adjoining the Taylor Bank (as it was called), in reference to Gus Meeks being back and testifying against himself, Bill Taylor said: "I know what the damn son of a bitch came for, and he'll get what he came for." In talking about the cattle scrape, Dillinger asked Bill Taylor if he had seen them, meaning Meeks and his brother-in-law, Page, when Taylor replied: "Yes. I'll kill the damn sons of bitches." This was at Cora, in October, 1893. Meeks was convicted in the next month, November, 1893, of cattle stealing. In February, 1894, when talking with Bill Taylor about Meeks' expected return, Merreck said to Taylor: "What are you going to do with Gus Meeks?" "Says I, 'Bill, they told me he is going to be pardoned out of the penitentiary to testify against you.' He says, 'We'll have to get Gus out of the way.' Says I, 'How are you going to do that, Bill?' He says, 'I'll shoot the son of a bitch if I have to.'" On the Monday next preceding the killing, Bill Taylor, when talking of Meeks, said to Phillips: "We'll get him out of the way; we'll get him out of the way, if we have to shoot him out of the way."

George E. Taylor met Pierce in Browning the latter part of April or first of May (after Meeks had been pardoned out of the penitentiary), and they got to talking about the trouble Bill Taylor had been in in reference to Meeks' return and to the cattle stealing affair in which Bill Taylor was implicated and for which he had been indicted, when Pierce said to George: "George, I believe they are going to make it hard on Bill this next trial," whereupon George, referring to Meeks, replied: "Well, we'll get the son of a bitch out of the way." Then Pierce said: "George,

you nor Bill can't do anything with Gus, he has no confidence in you," when George said: "Frank Leonard and him are all right and Frank will attend to that."

Not long did Gus Meeks enjoy his freedom at Milan before he began to be visited by the Taylor brothers; for less than two weeks after his arrival at Milan they began to visit him there. They came one Sunday night about 10 o'clock after church was out. They were not together. George came first. The object of the visit was to induce Meeks to leave the country and not to appear as a witness against Bill Taylor either in regard to the cattle business or the forgery of the check, and for this Meeks was to receive a sum of money from the Taylors. Three or four times George sought during this interview to induce Meeks to *go outside*, and see Bill, and have a talk with him, but Meeks steadily refused each time, telling George to bring Bill into the house, and each time George would go out of the house and pretend to *hunt* Bill, and would then come back and ask Meeks to go out and help *hunt* Bill. Finding Meeks could not be induced to leave the house, George finally went out, and *discovering* Bill, brought him into the house, when a conversation of the substance and effect above stated took place. The Taylor brothers did not leave until about 11 o'clock that night. During this visit Meeks told Bill Taylor that nothing less than $1,000 could put him back in the situation he was in; and that Taylor was the cause of that situation. Taylor's answer to this charge was not overheard by Mrs. Meeks.

After that George Taylor called to see Meeks, presumably for the above indicated purpose. Bill Taylor passed the house several times, and would peer in to see if he could see anybody. Awhile after this

Meeks went to Cora to meet Bill Taylor, but as the trial court would not let the witness, Mrs. Meeks, state what purpose her son expressed for going to Cora, that purpose remains undisclosed.

It is also in evidence that the sum finally agreed upon between the defendants and Meeks as the price of the latter's leaving the country and failing to testify against Bill Taylor, was that Meeks was to receive $800 and a wagon and team. The evidence also shows that Bill Taylor received from Meeks this letter:

"MILAN, Mo., May 7, 1894.
"W. P. Taylor:
"I will be in Cora to-morrow. Come up on freight without fail. I want to see you.
"Yours as ever,
"G."

And that Taylor responded to this request by going to Cora on the eighth of May and meeting Meeks, and that on May 9, 1894, Bill Taylor received another letter (which was lost) from Meeks, requesting him to come up again to Cora at 10 o'clock on the freight, and that in response to this lost letter the following letter was written by Taylor to Meeks:

"F. A. LEONARD.                    W. P. TAYLOR.
"PEOPLE'S EXCHANGE BANK.
"BROWNING, Mo., May 10—94.
"Be ready at 10 o'clock. Everything is right.
"XXX."

The genuineness of this letter was abundantly established, as well as admitted by Bill Taylor. When Meeks received the letter he put it in the envelope which contained his pardon and after the occurrence of the homicide it was found and delivered by Mrs. Meeks to Mr. Pierce, the prosecuting attorney of

Sullivan county.    This letter was mailed on the day of its date and was received on the same day about 1 o'clock in the afternoon.    The trial court refused permission to counsel for the state to offer in evidence the postmark on this letter.    1 Greenleaf, Evid., sec. 40.

There is no evidence that Bill Taylor, nor does he pretend, went up to Cora on the tenth of May, 1894, in compliance with the alleged request in the alleged lost letter, and of the implied promise in the just quoted letter.    Nor did either of the defendants deny the threats testified to have been made by them.

Late in the afternoon of May 10, 1894, George Taylor harnessed his team, hitched them to his father's farm wagon, loaded two wheels belonging to his own wagon, and drove to Browning;    he drove up to a blacksmith shop and unloaded the two wheels, where they were left, and have never been removed; from there he went to the bank where his brother was, and after talking to Bill Taylor some little time, drove down to Bill's house, unhitched his team from the wagon, put them in the stable and fed them, and ate supper; some time after supper, the team was again hitched to the wagon, and Bill Taylor was seen carrying some bed quilts out to the wagon.    George Taylor then drove away, going in an easterly direction, and was seen at the north part of Browning by Belitha McCollum, driving along the road in an easterly direction; that after going about a quarter of a mile east of McCollum's place, he heard the wagon turn north, and none go south or east; at the point where this wagon turned north, it went in the direction of Milan, while the road leading south led to George Taylor's residence; at the point where McCollum saw George Taylor in the wagon the road crosses the railroad track, and the road going north again crosses the railroad track about a quarter of a mile northeast of McCol-

lum's place; a few minutes after George Taylor had passed in the wagon, McCollum saw Bill Taylor walking up the railroad track in the direction in which George had gone in the wagon, and the theory of the state is that when he got to the second crossing of the railroad and the state road, a little over a quarter of a mile from McCollum's house, that Bill got into the wagon with George.

Hoke and Jennings testified that they were coming along the road leading from Browning to Milan that night, and that they saw William Taylor and some man they did not recognize in a farm wagon driving rapidly in the direction of Milan; that the point at which they saw them was about four and a half miles north of Browning.

The testimony of Mrs. Meeks shows that on the night of May 10, Gus Meeks and his wife did not retire, but had bundled up their effects ready to leave; that the children lay upon the bed with their clothes on so that they might be ready; that between 11 and 12 o'clock George E. Taylor came in and announced that everything was ready; that Gus asked him, "Where is the team?" George answered, "We have to keep the team moving; Bill is with the team." The arrangement was that a trunk was to be given them when they reached George Taylor's house in which to place the bundles; among them was a good feather bed tied up in quilts; Meeks and George Taylor then took the bundles of goods and carried them out to the wagon. When Gus Meeks returned from carrying bundles out to the wagon, his mother asked him if Bill Taylor was out there, and he answered he was; that there were none out there but Bill and George.

Upon objection made by defendants this answer, though plainly a part of the *res gestae*, was excluded by the court. A similar ruling would have excluded

similar statements made by George Taylor in reference to his brother being with the team.

Before Gus left, his mother testified that as he was about to depart: "He stooped down and kissed me; I begged of him not to go, for I told him it was a *trap* for him," etc. Mrs. Meeks then carried her eighteen months old babe, and with her other two children got into the wagon; and the Meeks family, consisting of father, mother, and three little girls, began the fatal ride in charge of George and Bill Taylor, going in a southerly direction. Mrs. Meeks testified that after they left, she, standing in her door, heard the wagon going south. That it did go south is plainly shown by subsequent occurrences.

The next morning, soon after day, little Nellie Meeks, the daughter of Gus Meeks, who had started with her parents the night before from the home of her grandmother in Milan, wandered up to the home of Mrs. Sallie Carter; that Mrs. Carter saw her in the yard; that Nellie came crying with the blood and straw matted in her hair; that her face and clothing were bloody; that she informed Mrs. Carter that her little sisters were down in a straw stack in the direction from which she had come that morning. That she told Mrs. Carter that her father and mother were up in the road. Mrs. Carter called her nephew, Jimmie, a boy a little more than ten years of age, and sent him to the straw stack in Taylor's field; that she looked and saw a man harrowing in the field; that she watched her nephew and he went directly to this man, who was George E. Taylor; that George E. Taylor at that time was harrowing southeast of the straw stack and was driving east; that Jimmie Carter told George Taylor that a little girl had come to his house and told Mrs. Carter that her little sisters were in that straw stack,

and little Jimmie Carter testified that George Taylor immediately asked him: "*What did she say about her ma and pa?*" That Jimmie replied that she had said they were up in the road. Jimmie suggested to George E. Taylor: "Let's go and get them out." George replied: "No, let someone else do that; come with me to the house." That George, taking young Carter with him, drove immediately through the meadow to the house; that George left Carter with the team and went into the house, and after some time Mrs. Carter, who had watched every movement of George Taylor and her nephew, beckoned to Jimmie to come home, which he did; that she then sent him with Nellie back to the straw stack and they there found dead bodies.

The testimony shows that after young Carter returned home George E. Taylor saddled his horse and rode to Browning; that he was seen by several persons riding rapidly along the road; that when he got to Browning he went immediately to Bill Taylor's bank, and together they held a hurried conversation; that Bill Taylor then saddled his horse and they rode away rapidly together, going in an easterly direction; that when they reached the timber where their father was hauling wood, about seven miles from Browning, they dismounted, left their horses, and made their escape and were not seen and recognized again until apprehended in Arkansas by Jerry South.

After Jimmie Carter and Nellie Meeks had returned from the straw stack, Mrs. Carter alarmed and notified the neighborhood, and the people began to gather about the scene of the killing and the strawstack, where they found that Gus Meeks and his wife and two children were dead and had been thrown into a small hole or excavation and dirt thrown over their faces, all of which had been covered by about eighteen

inches of straw.   Gus Meeks, Mrs. Gus Meeks, and the little girl and the babe were identified by the witnesses, who say that their faces were so completely covered with dirt that they had to clean it off for the purpose of identification.   An investigation of the surroundings showed that at Jenkins hill, about a mile north of the straw stack where the dead bodies were found, blood was found in the road, the print of a man's knee in the mud, and a revolver which was afterward identified as the property of Gus Meeks, was also found.   It had rained the night before the killing, and there was evidence there of someone having been dragged up this hill.   The witnesses testified that they also discovered there the track of a woman and a little girl.

The evidence shows that Jenkins hill, the scene of the killing, was a mile and a half south of the line between Sullivan and Linn counties, and in Linn county, Missouri.

The witnesses tracked the wagon from Jenkins hill through a hedge and down through a meadow diagonally across six or eight rows of corn to the straw stack; the wagon there made a loop and followed as closely as possible the other track back through the meadow; from there the wagon track led up into George Taylor's lot, where it was found standing that morning. At the place where the wagon was standing was about a bushel of clay, which, the testimony shows, George Taylor scraped from the wagon the morning of the killing; that the road from Milan to Browning was of a clayey nature; that such clay was abundant on Jenkins hill, and that a heavy shower of rain had fallen along that road and in that vicinity the previous day.   All of the testimony shows that there was no other wagon track from Jenkins hill to the straw stack and back to George Taylor's lot except this one.

Witness James Harris, who came to George Taylor's early the morning after the killing, found George out in the stable washing the mud off of the legs, sides, and bellies of his team, and afterward saw him scrape the clay from the wagon in the lot.  Harris hitched the team to this wagon and drove it over to old man Taylor's; there removed the wagon bed and hitched another team to the wagon for the purpose of hauling wood.  Harris testified that he found blood upon the bottom of the wagon and upon the coupling pole, and that old man Taylor took straw and wiped it off.

Sheriff Barton and others found blood in the wagon bed and upon the side boards, and they testified that upon an examination of the wagon later, these spots had been burned off.

Witness Freeman found remnants of burnt clothing, feathers, and scraps of bed ticking about two hundred yards north of George Taylor's house in the woods in a secluded spot, where a fire had been built, covering a burnt space of ten by seven feet.  This was a few days after the murder.  One of the remnants was saved and identified by Mrs. Martha J. Meeks as a portion of a new pair of pants Gus Meeks had carried away with him in one of the bundles the night of the killing.

Witness Kittie Edens, who lived very near Jenkins hill, testified that during the night of the killing she heard four or five pistol shots in the direction of Jenkins hill.

An examination of the harrow tracks showed that George Taylor was harrowing along the wagon tracks, *diagonally* across the rows of corn or rather corn rows and around the loop made at the straw stack, and to the west side, then south through the cornfield and meadow to the house, and his own testimony shows that the corn had only been planted about a week

before, and was, of course, not sufficiently advanced to be harrowed. The testimony further shows that the ground was in an unfit condition by reason of the recent rains, to be harrowed.

After the escape of the defendants into the woods, nothing was heard of them until they were apprehended in Arkansas by Jerry South and brought back and delivered to sheriff Barton at St. Louis, who took them to St. Joseph for safe keeping.

In a conversation detailed by Jerry South, the defendant, William Taylor, admitted and stated in the presence of his brother, George Taylor, on the train between St. Louis and Macon City, that they were at Milan on the night of the murder, and that they took the Meeks family in the wagon as far south as the "Stone corner," about one mile east of Browning, twelve miles south of Milan, and one and a half miles north of where the killing occurred; that they paid Gus Meeks the $1,000 and left them at that corner with the team and wagon; Bill Taylor also admitted writing the letter introduced by the state, "Be ready at 10 o'clock. All is right." These admissions and confessions were detailed to South after South had informed the Taylors, at their request, what sheriff Barton and Mr. Pierce had said about the testimony the state had against them; that George Taylor made no denial of any of the admissions and statement made by William Taylor.

The testimony upon the part of the defense tends to prove an alibi; that on the night of the killing the defendant, George Taylor, was at home with his family upon his farm, four and one half miles from Browning. This is testified to by George Taylor, his wife, and Mrs. Gibson, the mother of Mrs. George Taylor; that the defendant, William Taylor, was at home in Browning on the night of the murder, with his family,

which consisted, according to his own statement, of his wife and three children, neither of whom testified to his presence at home that night. Mrs. Van Wye, and her daughter Alpha, testified to having seen Bill Taylor in his bank at Browning about 10 o'clock the night of the murder. In their cross-examination, contradictory statements are admitted by both. They are also contradicted by the state's witnesses, Mrs. McPhetridge, Schooler, and Pulliam. The Bailey girls testify to having seen George Taylor coming home from Browning about 9 o'clock the night of the killing; they are, however, contradicted by a number of other witnesses, among whom are the Arnold girls and Walter Gooch. Albert Taylor, a brother of the defendant, also testified that George Taylor was at home the night of the killing, about 9 o'clock.

The defendants testified in their own behalf. Bill Taylor stated that George took supper at his house the evening of May 10, and put up and fed his team; that after supper, he (Wm.) put a quilt and blanket in the wagon, and that George started home, driving the team; that soon after George left, he went down to the bank, where he remained until about 10 o'clock, then went home and did not leave until morning, and when he opened the bank in the morning George came on horseback and reported his discovery; that he saddled his horse and they both left town and went to where his father and brother were at work in the timber; that they left their horses with their father and went afoot; that they did not tell their father why they were leaving or what they had heard or discovered. The defendant states that he went to Cora on May 8 to see Meeks, and there agreed to pay him $50 to enable him to leave the country; that he did not pay him the $50. Admits that he wrote the letter introduced by the state, ''Be ready at 10 o'clock. All

is right;" that after leaving their father that morning, they went to Arkansas, and were going under the names of William Price and George Edwards; that they had a talk with Jerry South at Buffalo City, and to him they admitted they were the Taylors; that this conversation occurred under a walnut tree west of the house of E. L. Hays. In this statement the defendant is contradicted by both South and Hays. Hays states that the defendant and South had no conversation except at Hays' store, and about general topics; that Hays and South were together all the time except when South went down to the river to see Cravens, at which time the Taylors were up town.

George E. Taylor, the other defendant, testified that he lived four and a half miles southeast of Browning; that he got to town on May 10, about 4 o'clock in the afternoon; that his brother William assisted him in unloading the wagon wheels; that he has not seen the wheels since; that he had no other business in Browning except to take the wheels; that he put up and fed his team at William Taylor's and ate his supper there; that he started home about dusk; that he drove directly home; that Mr. and Mrs. Dave Gibson (his father-in-law and mother-in-law) staid at his house that night; that he saw and talked to both of them upon his arrival home that night and the next morning; that state's witness, Harris, came over before breakfast that morning, hitched his father's team to the wagon (the same team and wagon he had used the night before) and drove to his father's; that he hitched up his team and went to harrowing; that the corn was coming up; that he commenced harrowing east of the straw stack and drove to the west side of the field and then east, south of the straw stack; that while going east a little boy came to him and said a little girl had come to their house and told them that

her two sisters were in the straw stack, and her father and mother were up in the road; that he drove on east to the meadow and then north to where he began harrowing and then went to the stack.   (In this statement he was contradicted by Mrs. Carter and Jimmie Carter and all the witnesses who saw and examined the harrow tracks that day).   That he kicked up the straw and saw Gus Meeks' face.   (In this he was contradicted by all the witnesses who saw the bodies in the straw stack and who testified that the faces were covered with dirt and the bodies with about eighteen inches of straw, and that the dirt so covered the faces that they could not be identified until it was scraped off).   That he drove to the barn and saddled his horse and went to town; that upon arriving at Browning he saw William Taylor and they immediately left, going east to where his father was hauling wood; left their horses and took to the woods; that they did not tell any one what they had seen, found, or discovered; that he had seen no wagon tracks in the field that morning while harrowing.

The defendants, explaining their flight, assigned as their reasons for going that they feared they would be accused of the crime and they left to protect themselves from mob violence.

The above is considered a sufficiently full *resume* of the evidence gathered from three large type written volumes, aggregating nearly *sixteen hundred* pages. Other facts in evidence, if necessary, will be adverted to hereafter.

With this basis of evidence before us, let us now proceed to the examination of the various errors assigned; there are many of them.

1.  Error is assigned on the action of the court in denying the motion of defendants made at a previous term of the court for a rule on certain attorneys to show

by what authority they appeared on behalf of the prosecution in this cause. Indications of this motion having been made and denied, appear in the record made at such previous term. Such matters, however, are purely matters of *exception;* they can not be preserved by inserting them in the record; the only way possible for their preservation, upon an adverse ruling being made, is to present and have signed and filed a bill of exceptions at the term when the ruling occurs. Matters which are not in fact a part of the record, can not be made such by a mere recital of the clerk. A bill of exceptions is the only repository known to the law where matters of mere exception can be preserved. *Nichols v. Stevens*, 123 Mo. *loc. cit.* 119; *State v. Duncan*, 116 Mo. *loc. cit.* 308; *Ryan v. Growney*, 125 Mo. *loc. cit.* 480.

And an exception taken at one term, but not preserved, can not be galvanized into life by incorporating it into a bill of exceptions taken at a subsequent term, and so it has been decided.

2. With reference to the charge that Snow and Henry, deputy sheriffs, were guilty of improper conduct, and were prejudiced against defendants: As to Snow, though his name is mentioned in the affidavit filed by Mr. Lozier, there are no facts specified against him, and as to Henry, though the conversation as alleged to have been had by Henry with Mr. Lozier was improper and indicative of prejudice, yet such alleged conversation occurred on the very day the venire of three hundred men was returned, and as Mr. Lozier was fully informed of the subject of that conversation, and being one of the counsel of defendants, it was his duty to make it known to the court by suitable method of procedure, and he having failed to do so, defendants can not now take advantage of the opportunity he then

let slip.   *State v. Burns,* 85 Mo. 47;  1 Bishop New Cr. Proc., secs. 932, 932a, 947.

Besides, the affidavit of Mr. Lozier is contradicted by an affidavit of Mr. Henry, and when this is the case, our custom is to decline to interfere with the ruling of the trial court made on affidavits *pro* and *con.   Morgan v. Ross,* 74 Mo. 318;  *State v. Gonce,* 87 Mo. 627;  *State v. Cook,* 84 Mo. 40;  *State v. Howard,* 118 Mo. 138; *State v. Nocton,* 121 Mo. 537.

3.   The selection of the forty who were to compose the larger panel from which the smaller panel was to be selected, has been attacked directly and indirectly in several ways.

*a.*   Copies  of  the  *Corrollton   Democrat*  were admitted in evidence, and the files of that paper are now among the exhibits in this cause, so that the claim that error was committed in this regard has no foundation in the record.

*b.*   The doctrine of the *State v. Culler,* 82 Mo. 623, was announced to be this:   "One who has read the evidence taken before the coroner in a case of homicide, either as originally written or as printed in a newspaper, or who has read the evidence in a criminal cause on preliminary examination before a justice of the peace, and formed an opinion therefrom, in either case is, as matter of law, disqualified from serving as a juror in the trial of such cause.   Such person can neither form one of the list of qualified jurors served on defendant before trial, nor one of the jury which tries the issue joined."   Though the ruling there made was afterward discrowned in *Bryant's* case, 93 Mo. 273, yet it was subsequently recrowned in the afteroccurring cases of *State v. Hultz,* 106 Mo. 53, and *State v. Robinson,* 117 Mo. 649.   See, also, *State v. Hopkirk,* 84 Mo. 283;  *State v. Wilson,* 85 Mo. 134.

Our statute is a very plain one, and one easily under-

stood. It is as follows: "It shall be a good cause of challege to a juror that he has formed or delivered an opinion on the issue, or any material fact to be tried, but if it appear that such opinion is founded only on rumor and newspaper reports, and not such as to prejudice or bias the mind of the juror, he may be sworn." Sec. 4197, R. S. 1889.

The words in the section, *"newspaper reports,"* first appeared in the revision of 1879, Revised Statutes, section 1897.

The rulings in *State v. Culler, State v. Hultz,* and *State v. Robinson, supra,* do but follow in this regard *State v. Rose,* 32 Mo. 346, and *Baldwin v. State,* 12 Mo. 223. And it will not do to say that the "march of civilization" (93 Mo. 306) shall be allowed to disregard and trample on a plain constitutional right.

The only trouble with our statute heretofore has been that attempts have been made from time to time, *pro re nata,* to hybridize and cross it with the statutes and rulings of other states.

Adhering then to *Culler's* case, and those which followed it, let us see if the lower court transcended the ruling there laid down. It is claimed that that court erred in refusing to permit the editor of the *Carrollton Democrat* to testify in regard to the exactness with which that paper copied the evidence adduced at the first trial. Here is what the *record* says about the matter:

"Counsel for defendants also offered in evidence the *Carrollton Daily Democrat* of March 28, 1895, March 29, 1895, March 30, 1895, March 31, 1895, April 2, 1895, and April 3, 1895. The one of April 3 is not exactly introduced; that only contains the argument. Which said papers were admited in evidence, and are hereto attached. Now we want leave to show by Mr. Painter what these papers contain and how the evidence

reported therein was obtained.    Swear Mr. Painter as a witness.

"*The court:* I will hear you further about that.

"*Mr. Conkling*: We offer to prove by Mr. Painter, the editor of the *Carrollton Democrat*, that this report of the evidence which appears in the weekly papers was taken *verbatim* from the report which appeared in the daily papers, and that the report which appeared in the daily papers was taken from the stenographic report of the evidence which was taken here at the trial, which was correctly reported and correctly transcribed and correctly printed.

"*The court:* I will hear you, if you want to make that formal proof, after a while.

"Said evidence was not admitted, to which action and ruling of the court defendants  excepted."

Though the foregoing extract from the record is somewhat ambiguous, is not as plain as it might have been made, yet when we read it carefully over, as well as adjacent portions of the record, and find that defendants *never renewed their offer* to make the proof mentioned, we reach the conclusion which appears to be a reasonable one, that the refusal aforesaid was only a *temporary* one, relating merely to the *order* in which evidence should be introduced.    In order to establish that the lower court has erred, it should *affirmatively appear* that the offer to make the proof desired was *subsequently renewed.*    Where an attempt is made to convict the lower court of error, the error must be affirmatively shown or appear by necessary implication; conjectures and inferences will not subserve such a purpose.

A case strikingly analogous to the present one in its ruling on a similar point found in the record, is that of *State v. Owen*, 78 Mo. 367.    See, also, *People v. Sanford*, 43 Cal. 29.    Other cases disclose similar rul-

ings as the settled law of this court. *Miller v. Leeper*, 120 Mo. 478; *Wentzville, etc., Co. v. Walker*, 123 Mo. 670.

c.    Inasmuch as defendants failed to renew their offer, we have no evidence before us that the *Carrollton Democrat* contained *verbatim* reports of the evidence adduced at the first trial. *State v. Robinson, supra.*

d.    But conceding that such papers contain such full reports, still it does not appear that *all* of the evidence as reported was read by the respective jurors. Portions of it as published appear to have been read, but whether such portions were connected in regular sequence does not appear. It has been held that the hearing and reading of fragmentary portions of the evidence of the former trial, and the forming an opinion thereon, will not of themselves disqualify a juror; and that in order to his disqualification he must have heard or read *all* of the evidence taken at the former trial. *Com. v. Taylor*, 129 Pa. St. 534.; *Allison v. Com.*, 99 Pa. St. 32; 3 Rice, Ev. (Crim.) 202. The *Culler* case, to which we adhere, does not go as far as this.

e.    In reference to Martin M. Dyer, there was no error in excusing him from serving as a juror. He had been absent from the state for two years with intent to change his domicile, and had only returned the previous December, but it does not appear that this return was *animo manendi*. And it is not to be forgotten that a court may, of its own motion, examine venire men and excuse them, although not challenged by either party. 2 Elliott's Gen. Prac., sec. 531, and cases cited. And it is held that a court has a wide discretion in such matters, the exercise of which is not available error unless abuse of such discretion be shown. *Ibid.*

f.    It is quite apparent, of the jurors who composed the panel of forty, that they really had not formed or

expressed *opinions* in the strict or legal sense of that
term.   The average juror is not usually skilled in the
niceties of language, and frequently means that he has
an *"impression"* when he says he has formed an *opin-
ion*.  So that they honestly answered that such opin-
ion, to wit, impression, would remain until removed
by evidence, and it may be said that the human mind
would have to be changed throughout its entire or-
ganic structure, when this characteristic ceases to exist.
And, besides, the answers which most of them gave
were replies to adroitly put and complicated questions,
which could scarcely be correctly answered by a simple
negative or a simple affirmation.   The trial court no
doubt observed this prominent feature of the examina-
tion, and formed its conclusions accordingly.

   *g*.   The defendants, of course, were entitled to a
full and competent panel of forty men before announc-
ing their final challenges, but in reaching this stage of
the proceedings it became necessary to make what
might be termed intermediary challenges.   In making
such preliminary challenges, that is, challenges for
cause, this formula was observed at the close of the ex-
amination of each venire man: "Counsel for defendants
objected to this juror as disqualified and not qualified
to sit as a competent juror in this cause, and challenged
said juror for cause.   Objection and challenge over-
ruled, to which ruling defendants excepted."

   Now, nothing is better settled than that challenges
for cause must be *specifically* stated.   The particular
cause must be set forth.   *People v. Reynolds*, 16 Cal. 128;
*Mann v. Glover*, 14 N. J. L. 195; *Powers v. Presgroves*,
38 Miss. 227; *Southern Pac. Co. v. Rauh*, 49 Fed. Rep.
696; *Drake v. State*, 20 Atl. Rep. 747; 2 Elliott's Gen.
Prac., sec. 530, and other cases there cited.

   The *facts* constituting the cause of complaint were
not given in this instance; the challenge simply

State v. Taylor.

amounted to the statement of a *legal conclusion.* The rule should be the same here as it is where general objections are taken to evidence, that it is incompetent, immaterial, etc., and where it is held that general objections amount to nothing more than saying "*I object.*" Indeed, there seem to be more cogent reasons why specific objections should be urged in a case of this sort, where the question is as to the admission of a juryman, than where it is as to the admission of a piece of evidence. At any rate, in either case, fairness to the court and to adverse counsel alike demand the grounds of the challenge for cause to be particularly set forth.

*h.* At the close of the examination of the forty venire men from which the trial panel was to be selected, the same objections, couched in similar general terms, were made to each venire man. Then a challenge to the array was offered *ore tenus.*

It is the established rule at common law that a challenge to the array must be *in writing,* and this is the case also where the common law has not been abrogated by statute. 1 Chit. Crim. Law, 546; 2 Tidd's Prac. 851; *People v. M'Kay,* 18 Johns. *loc. cit.* 218; *People v. Doe,* 1 Mich. 453; *Ryder v. People,* 38 Mich. 269; *Queen v. O'Connell,* 1 Cox C. C. 397; 1 Thompson, Tr., sec. 98; *State v. Clark,* 121 Mo. 513.

*i.* And if the challenge be made first to the *polls,* it can not afterward be made to the *array. State v. Clark, supra,* 1 Chit. Crim. Law, 545.

*j.* But one point in regard to the selection of the traverse jury remains for consideration: It is claimed that reversible error was committed by the court in refusing to allow defendants to have forty-eight hours in which to announce their challenges to the forty venire men. By a former law, a law existing at the time the crime charged in the indictment herein was perpetrated, forty-eight hours were allotted a defendant in which to

make his challenges, but by a later statute, the time for such purpose was cut down to twenty-four hours. Laws, 1895, p. 165. And upon this basis it is urged that the latter law is nonapplicable to this case, and that so to apply it renders it an *ex post facto* law, violative alike of section 10, article 1, constitution United States, and section 15, article 2, constitution Missouri.

In the motion for a new trial filed below, there was no reference made to the constitution of the United States, nor does any mention of it occur anywhere in the record. We observe nothing in the law of 1895 which has any tendency to violate either the organic law of the United States or of this state. We regard that act as a change merely in the *method of procedure*, and therefore not falling under the ban of either federal or state constitutions. Such methods are subject to change at the will of the legislature, which, when exercised in the form of law, does not trench upon any vested or substantial right which a defendant had at the time he perpetrated the offense, though this was before the enactment of the procedure-altering statute.

An eminent jurist and author has condensed this matter within a very small compass, where he says: "Remedies must always be under the control of the legislature, and it would create endless confusion in legal proceedings if every case was to be conducted only in accordance with the rules of practice, and heard only by the courts in existence when its facts arose. The legislature may abolish courts and create new ones, and it may prescribe altogether different modes of procedure in its discretion, though it can not lawfully, we think, in so doing, dispense with any of those substantial protections with which the existing law surrounds the person accused of crime. Statutes giving the government additional challenges, and others which author-

ized the amendment of indictments, have been sustained and applied to past transactions, as doubtless would be any similar statute, calculated merely to improve the remedy, and in its operation working no injustice to the defendant, and depriving him of no substantial right." Cooley's Const. Lim. [6 Ed.] pp. 326, 327, and cases cited. See, also, *Gut v. State*, 9 Wall. 35; *Cummings v. Missouri*, 4 Wall. 326; *State v. Jackson*, 105 Mo. 196.

An admirable discussion of the present topic is found in *People ex rel. v. McDonald*, 29 L. Rep. Annot. 834, by GROESBECK, C. J., of the supreme court of Wyoming.

Viewed, then, in any light, we must hold that no reversible error occurred either in impaneling or selecting the jurors who tried the issue joined in this case.

4. Among the thirty-one assignments contained in the motion for a new trial, the seventeenth states that the evidence is not sufficient to support the verdict. This ground of objection has not been mentioned in brief or oral argument of counsel for defendants, and seems to have been abandoned. And certainly more cogent evidence of guilt is rarely presented in a criminal cause, than the record herein furnishes. Unless all reliance is to be denied to human testimony, the defendants are guilty of the crime charged against them. Previous threats to commit the crime charged in the indictment, a crime afterward committed by *someone*, the powerful motive that one of the defendants at least had for its commission, the fact that Meeks, his wife, and children were in company of defendants when last seen alive, the fact that defendants were to call for Meeks and family on the night of the tenth of May, 1894, and that they did so, in order to *take them out of the country*, the fact that both of the

defendants were seen and heard wending their way toward the place appointed, to wit, Milan, the fact that the wagon turned south on the road from Milan toward Browning, the fact the road was of clay, and rendered muddy by a recent rain, the fact that during the night of May 10–11, a witness who lived close by heard pistol shots on Jenkins hill, only about one and one half miles north of the straw stack in George Taylor's field in which the bodies of Meeks and family were found soon the next morning, the fact that Gus Meeks' pistol was found on the side of the road on Jenkins hill where blood was found in the road, the print of a man's knee in the mud, and where a struggle had evidently taken place the previous night, and a human body or bodies had been dragged up the hill, and the track of a woman and a little girl seen there, the fact that witnesses the next morning tracked a wagon from Jenkins hill through a hedge and down through a meadow across six or eight rows of corn on George Taylor's farm to his straw stack and thence to his barn lot, the fact those tracks were the only wagon tracks seen in that locality, the fact that next morning George Taylor's wagon was found in his barn lot covered with clay and he was engaged early next morning in scraping the clay from the wagon, and washing the clay off the legs, sides, and bellies of his team, the fact that blood was discovered on the bottom and sides of the wagon bed and on the coupling pole, the fact that old man Taylor, father of defendants, wiped the blood off the coupling pole, the fact that a *new bottom* was afterward made for the wagon bed, and the sides of the wagon bed *burned*, as if to remove traces or stains of some kind therefrom, the fact that George Taylor was engaged at an early hour the next morning in harrowing his field of corn (or rather field where corn was *planted*), the ground of which was unfit to be harrowed

State v. Taylor.

because of recent rains and only planted the week before, and the corn was *not yet up*, and harrowing it *diagonally* across the rows, with the apparent purpose of obliterating the only wagon tracks there found, the fact that he denied seeing those tracks, the fact that when informed by Jimmie Carter of little Nellie Meeks' escape from the straw pile, and that she said her two sisters were in there, that George Taylor immediately asked, "*what did she say about her ma and pa?*" the fact that he refused, at Jimmy's instance to examine the straw pile to see if little Nellie's statement was true, the fact that George Taylor instantly quit harrowing and took Jimmie Carter with him to his house as if to prevent the little boy from making search in the straw pile, the fact that George Taylor on reaching home, immediately mounted his horse and went rapidly to Browning, where, joined by his brother Bill, they rode away in great haste to where their father was in the woods, and there, delivering their horses to him, and without any explanation whatever to him, took to the brush, and were not seen afterward till captured and brought back from Arkansas, the fact that Bill Taylor was afraid of a mob, although there was seemingly nothing in the *locality* where the bodies were found to connect *him* with, or implicate *him* in, the crime, the fact that Bill Taylor, though he admits writing the letter of May 10, 1894, and states that it appointed a meeting with Meeks in *Cora*, yet does not pretend that he *kept that appointment*, paid Meeks the $50, nor made any excuse therefor, the fact that the same week there was found on George Taylor's farm and within about one hundred and fifty yards of his house, a place in the thick timber where clothing, bed tick, and feathers had been then recently burned and a portion of Gus Meeks' new pair of pants which he took away with him in a bundle on the fatal night was there found and

afterward recognized and identified by his mother, the fact that neither of defendants denied the threats they were proven to have made, and therefore such threats stand admitted (*State v. Musick*, 101 Mo. *loc. cit.* 271; *State v. Alexander*, 119 Mo. 461; *State v. Patrick*, 107 Mo. 179; *State v. Patterson*, 116 Mo. 512); these numerous facts do so weave the web of circumstance around the defendants and fetter them to the brutal and bloody deed, that it would seem that there could be but one opinion as to their guilt.    It is true they introduced evidence tending to show an *alibi* for each of them, but there was much, and very cogent, evidence to the contrary, and it therefore fell within the exclusive province of the triers of the fact to determine the truth of the matter; this they have done, and we can not say, after a careful examination of the facts preserved in the record, that their verdict does not find ample support in the evidence.

5.    We pass now to the consideration of the instructions.

Instruction number 6 is assailed by counsel for defendants as being highly improper.    It is as follows: "The court instructs the jury that, under the laws of this state, the defendants and Della Taylor, the wife of the defendant George E. Taylor, who have testified in this cause, are competent witnesses so to do, but the fact that the two defendants, William P. Taylor and George E. Taylor, are the defendants on trial, and that Della Taylor is the wife of the defendant George E. Taylor, may be taken into consideration by the jury, as well as their interest in the result of the trial, in determining the weight, *if any*, should be given to their testimony."    The italicized words in the last line of the instruction are those particularly objected to.

On behalf of and at the instance of the defense, however, the court gave instruction number 8, as fol-

lows: "Under the law of this state each of the defendants is a competent witness to testify in his own behalf and in the behalf of his codefendant, and their evidence can not be disregarded because they are the defendants and stand charged with the commission of a crime. The law presumes the defendants to be innocent of the crime charged, and, as they are competent witnesses under the law, you should, therefore, fairly and impartially weigh and consider their testimony, together with all the other testimony in the case."

In *State v. McCollum*, 119 Mo. 469, appealed from *Linn* circuit court, the tenth instruction given on the part of the state was the following: "The jury are further instructed that, while the defendant is a competent witness to testify in his own behalf, the jury, in determining what weight, if any, they will give his testimony, have the right to consider his interest in the result of his prosecution, and they are further instructed that what the defendant has testified to against his interest, if anything, is to be taken as true, and what he testified to in his own favor is to be given only such weight as the jury may believe, from all the evidence in the case, it is entitled to."

On the part of the defendant in that case, however, instruction number 7 was given: "The court instructs the jury that they have no right to disregard the testimony given by the defendant on the ground that he is a defendant and stands charged with the commission of the crime alleged in the indictment. The law presumes the defendant to be innocent until he is proven guilty, and inasmuch as the law allows him to testify as a witness in his own behalf, the jury should fairly and impartially consider his testimony, together with all the other evidence given in the case; and if from all the evidence given the jury have any reasonable doubt as to defendant's guilt as charged, then, and in that case,

the defendant is entitled to the benefit of such doubt, and should be acquitted."

When speaking in *McCollum's* case of instructions 10 and 7 aforesaid, BURGESS, J., said: "Another contention is that the court committed error in giving the tenth instruction on behalf of the state. When this instruction is taken in connection with the one given at the instance of the defendant on the same subject-matter, it is impossible to see how the defendant could have been prejudiced, or the jury misled thereby. We are constrained to hold, after some hesitation, that there was no error committed in giving this instruction."

Adhering to the ruling laid down in that case, it must be ruled in this one, that in consideration of the eighth instruction given at the instance of defendants, no prejudicial or reversible error was committed against defendants, by reason of giving instruction number 6 on behalf of the state as heretofore quoted.

Hereafter the words "*if any*" should be omitted from instructions respecting the testimony of defendants. Had it not been for the eighth instruction aforesaid, the judgment would have been reversed.

6. Instructions 1 and 3 given on part of the prosecution are the following:

"1. The court instructs the jury that, if they believe and find from the evidence in this cause, beyond a reasonable doubt, that at the county of Linn and state of Missouri the defendants, William P. and George E. Taylor, or either of them, and the other present aiding, abetting, or consenting thereto, did on or about the tenth day of May, 1894, feloniously, willfully, deliberately, premeditatedly, and of their malice aforethought, kill and murder one Gus Meeks in the manner and form charged in the indictment, you should find the defendants guilty of murder in the first degree and so state in your verdict."

"3. Evidence is of two kinds, direct and circumstantial. Direct evidence is when a witness testifies directly of his own knowledge of the main fact or facts to be proven. Circumstantial evidence is proof of certain facts and circumstances in a certain case from which the jury may infer other connected facts which usually and reasonably follow, according to the common experience of mankind. Crime may be proven by circumstantial evidence as well as by direct testimony of eye witnesses; but the facts and circumstances in evidence should be consistent with each other and with the guilt of defendants, and inconsistent with any reasonable theory of defendant's innocence. If, therefore, you believe, from the facts and circumstances proven in this case, beyond a reasonable doubt, that the defendants or either of them, the other being present aiding, abetting, or consenting thereto, on or about the tenth day of May, 1894, at the county of Linn and state of Missouri, did feloniously, willfully, deliberately, premeditatedly, and of their malice aforethought, shoot and kill Gus Meeks, you are warranted in finding them guilty of murder in the first degree, though no witness has testified of his own knowledge as to the actual facts of such shooting and killing."

The objection to these instructions, presented by defendants' counsel, is this: That they require a conviction, if one was had, to include *both* defendants.

Such a construction is not warranted by those instructions. Each of them requires the *presence of each* of the defendants in order to a conviction of *both.* No jury of ordinary intelligence would need to be told that they should not convict *both* defendants if only *one* was present, nor *one* if *both* were present.

An objection to the third instruction of more weight than that just urged by counsel lies in the fact that such instruction tells the jury "that the defend-

ants, or either of them, the other being present, aiding, abetting, or *consenting* thereto," etc.    Taken *literally,* this instruction is *technically* incorrect, because it authorizes a conviction of one of the defendants if he was present and *"consenting"* to the perpetration of the crime charged.    But inasmuch as the jury, if they believed that *one* of the defendants was present at the scene and time of the *massacre* on Jenkins hill, must have believed that *both* were then present, and that if present, that such presence was manifested by something more potent than simple *mental approval.*    We do not regard the instruction of such a prejudicial nature as to warrant a reversal.    On which point see *State v. Cox,* 65 Mo. *loc. cit.* 33.

We are forbidden to reverse a judgment even in a *criminal* case, where the "defect or imperfection   *   *   * does not tend to the prejudice of the substantial rights of the defendant upon the merits."    R. S. 1889, sec. 4115.

7. Complaint is made that an instruction was not given defining the term *alibi* and applying it to the facts and evidence in this case.    For the defense this instruction was given with reference to that point:

"6. The law requires the prosecution to prove the defendants' guilt beyond a reasonable doubt, but it does not require the defendants to prove an 'alibi' beyond a reasonable doubt.    Although the evidence of an alibi falls short of the weight of moral certainty as to the existence of the alibi, yet, if it leaves in the minds of the jury such a doubt or uncertainty that, if taken by itself, they could not find for the alibi or against the alibi, then the jury must carry such doubt into the case of the prosecution and array it there as an element of the reasonable doubt beyond which the prosecution must establish guilt.    The defendants are entitled as much to the benefit of such doubt as to any

other doubt raised by the evidence; and if its weight alone, or added to that of any other, be sufficient to raise a reasonable doubt as to the defendant's guilt, then the jury must acquit them."

This instruction we regard as sufficiently full under our recent decisions as to the meaning of the term *alibi* and its application to the facts in the case at bar.

8. Eight instructions were given on behalf of the state, which were in usual and approved form, and *twelve* on part of the defense, among them one in regard to *flight*, to the effect that if defendants fled, not to avoid arrest and trial, but to save their lives from mob violence, then such flight could not be considered by the jury in determining the question of defendants' guilt or innocence of the crime charged. The other instructions given for defendants were exceedingly favorable to them, and left nothing to be desired.

9. The thirteenth and fourteenth instructions asked by defendants but refused by the court, are substantially contained in instruction 14, as follows: "If any one of the jury, after having duly considered all the evidence, and after having consulted with his fellow jurymen, should entertain a reasonable doubt of the defendants' guilt, in such case the jury can not find defendants guilty."

This instruction was properly refused. It was confusing and misleading. The reasonable doubt to be entertained, should be entertained, if at all, by the *jury as a body*. The instruction, if given, would have authorized an acquittal of defendants if a single juryman had entertained a reasonable doubt as to defendants' guilt. *State v. Rorabacher*, 19 Iowa, 154; *State v. Hamilton*, 57 Iowa, 596; 2 Thompson, Tr., sec. 2495.

10. Error is charged to have been committed in the exclusion and in the admission of evidence, and to this topic we will now address ourselves.

*a.* The deposition of Gleason was properly excluded; its only purport was to show that while at Little Rock the defendants were not placed under any restraint, or handcuffed, etc. This evidence was wholly immaterial. It was entirely irrelevant to the issue joined, whether defendants were willing to return or had to be placed under restraint while in Little Rock or not. If defendants had offered such testimony it should have been ruled out as self-serving, and therefore immaterial and inadmissible. *State v. Musick,* 101 Mo. 274; *State v. Smith,* 114 Mo. 424.

The evident and only object in seeking the introduction of Gleason's deposition in evidence was to contradict, and thus impeach statements made by South. But our recollection of the latter's testimony is that he did *not* testify that defendants were placed under restraint while in Little Rock, and if he had, he could not be impeached by contradicting him on that point, the rule being that a witness can not be impeached by contradicting him as to matters which are not relevant to the issue on trial. 1 Greenleaf, Evid. [14 Ed.], secs. 462, 448; *People v. Dye,* 75 Cal. 108; *Seller v. Jenkins,* 97 Ind. 435; *Fitzgerald v. Williams,* 148 Mass. 467; *Morris v. Railroad,* 116 N. Y. 557; 2 Elliott's Gen. Prac., sec. 674, and other cases there cited; *Bank v. Murdock,* 62 Mo. 70; Starkie, Evid. [10 Ed.], 200–201, and cases cited; Whart. Crim. Evid. [9 Ed.], sec. 484.

*b.* It is contended that the testimony of Mrs. Gibson, the mother-in-law of George Taylor, taken before the coroner, should have been admitted in order to corroborate her testimony, attacked by the state through the medium of alleged contradictory statements. There is no doubt but what this course may be pursued in proper circumstances. But it seems the rule was stated too broadly in *State v. Grant* (79 Mo.

133) on that point, although warranted by the author-
ities there cited, which, at least, *Henderson v. Jones*, 10
S. & R.322 (overruled in *Craig v. Craig*, 5 Rawle (Pa.),
91); *Coffin v. Anderson*, 4 Black. (Ind.) 398, were
founded directly or indirectly on *Lutterell v. Reynell*, 1
Mod. 282, which long ago ceased to be authority in
England. *Rex v. Parker*, 3 Doug. 242.

When speaking on this subject, Greenleaf says:
"But evidence that he [the witness] has on other
occasions made statements similar to what he has
testified in the cause, is not admissible; unless where
a design to misrepresent is charged upon the witness,
in consequence of his relation to the party, or to the
cause; in which case, it seems, it may be proper to
show that he made a similar statement before that
relation existed." 1 Greenleaf, Evid. [14 Ed.], sec.
469.

Wharton says: "When a witness is assailed on
the ground that he narrated the facts differently on
former occasions, while on re-examination it is com-
petent for him to give the circumstances under which
the narration was made, it is ordinarily incompetent to
sustain him by proof that on other occasions his state-
ments were in harmony with those made on the trial.
On the other hand, where the opposing case is that the
witness testified under corrupt motives, or where the
impeaching evidence goes to charge the witness with a
recent fabrication of his testimony, it is but proper that
such evidence should be rebutted. Thus where on an
indictment for perjury a witness for the prosecution
swore that B. (the defendant in a trial for arson) was
not at the place of the burning at the time of the fire,
but was confronted at his cross-examination by his
testimony to the contrary on the arson trial, it was held
that as he had been thus discredited, he might be sus-
tained by showing that he had made to C., immediately

after the arson, a statement in harmony with that made by him on the perjury trial, though the particulars of the statement were inadmissible." Whart. Crim. Evid. [9 Ed.], sec. 492.

Inasmuch as the motives of Mrs. Gibson in testifying at the trial were not sought to be impugned, her testimony taken before the coroner was, under the authorities cited, inadmissible.

*c.* But her testimony taken before the coroner was inadmissible for the further reason that that testimony does not show the *date* of the night when she says she staid all night at George Taylor's. This being the case, the evidence of Mrs. Gibson taken before the coroner was obviously inadmissible, on this ground also.

*d.* The *record* shows on the examination in chief of defendant Bill Taylor by Col. J. B. Hale, and on the first page thereof (1192 of transcript), the latter asked the former the following questions and received the following answers:

"*Q.* Where were you on the tenth day of May—I will ask you first, you are a married man? *A.* Yes, sir.

"*Q.* Wife and two children? *A.* Wife and three children.

"*Q.* And reside in Browning? *A.* Yes, sir."

On a subsequent page of the transcript, the witness stated that he remained down town at his office and bank on the night of May 10 until about 10 oclock, whereupon his counsel asked him: "*Q.* Now, Mr. Taylor, where did you spend the balance of the night?" and the answer was, "Spent it at home." So that it would seem that the foundation for the question to the witness on cross-examination as to *with whom* he stayed on the night of the murder was laid by the examination in chief. But if such foundation had not been thus laid, it would be governed by the rule laid down in the follow-

ing cases:   *State v. Avery*, 113 Mo. 499;  *State v. Wisdom*, 119 Mo. 539;  *State v. Kennade*, 121 Mo. 405; *State v. Fitzgerald*, 130 Mo. 407.

*e.*   Doubtless technical error occurred in admitting in evidence the cross-examination of Mrs. Fowler, no cross interrogatories having been attached to the special commission under which her deposition was taken. But we hold, though this was the case, yet we do not regard the admission of such evidence reversible error.

*f.*   And we make a like ruling in regard to the reading by the state of the entire testimony of John Hoke, taken at a former trial.   Such portions of the testimony as were denied by the witness should only have been read in evidence, but we do not regard the reading of more than that as so prejudicial to defendants as to constitute reversible error.

11.   Having thus disposed of the objections to the admission and exclusion of evidence, we now proceed to examine the complaints made with reference to the conduct of prosecuting counsel while arguing the case to the jury.

And first as to the remarks made by Mr. Sidney Miller, prosecuting attorney of Carroll county:   It appears from the *record* that Mr. Miller, in discussing the testimony, had made the statement that Bill Taylor had testified that he and his wife and child constituted his family, and that Mr. Miller said: "And I ask you, gentlemen, why it was that Mrs. Bill Taylor * * * did not take the stand;" that immediately upon Mr. Miller speaking the words "Mrs. Bill Taylor," the court rapped vigorously with his knife, and said: "Hold on! Mr. Miller, hold on," and that during the rapping and interruption of the court Mr. Miller finished his sentence by saying, "did not take the stand," whereupon the court said:   "Mr. Miller, that argument is unwarrantable and improper; it is outside of the record and

you must desist. If you desire to argue this case, you must do so in a proper manner. Counsel arguing this case must proceed within the record and not depart from it." Thereupon Mr. Miller said: "I apologize, your *Honor. I assure you it was ignorance on my part.*"

*a.* It has been frequently held by this court that when such highly improper and prejudicial remarks are made, that if they are immediately followed by a proper rebuke from the court that such remarks thus rebuked will not constitute reversible error. *State v. Graves,* 95 Mo. 516; *State v. Dusenberry,* 112 Mo. 277; *State v. Brandenburg,* 118 Mo. 187; *State v. Howard,* 118 Mo. 145; *State v. Fitzgerald,* 130 Mo. 407.

In *State v. Bobbst,* 131 Mo. 328, no rebuke was administered by the court to transgressing counsel, and, in consequence, the judgment was reversed.

*b.* In the second place, the remarks of Mr. Minnis, one of the counsel for the state, were these: "He is a good man, and I know he has influence with juries, but Col. Hale may be wrong. He throws his eyes heavenward and tells you, gentlemen, that he believes these defendants are not guilty. But, gentlemen, Col. Hale, with the same solemn look, with the nervous twitches of the muscles of his face, this great pleader, has looked heavenward in about nine or ten other murder cases, and exclaimed in impressive tones, 'My client is not guilty.'" Objection was made to these remarks, but no ruling was made by the court, nor was one required. If such humorous passages as these call for reversal unless rebuked, we should record a great many reversals in this court.

*c.* In the third place, Ben F. Pierce, one of the counsel for the state, stated to the jury: "I am here from Sullivan county, representing Nellie Meeks and our people as best I can without the pay of one dollar;

simply doing my duty; a duty I owe to my people up there and a duty I owe to you. No more, no less; no pay, no reward whatever in. it." These remarks were deemed objectionable by defendant's counsel, and because the trial court did not indorse this view and administer a reprimand to Mr. Pierce, another exception was saved. We make the same ruling here as made in the preceding exception.

d. In the fourth place, L. A. Holliday, one of the state's counsel, said: "What is the testimony in this case? The testimony shows, in this case, one of the defendants was jointly indicted with this man Meeks. It is not necessary for me to state what this indictment is for." Objection was made to this remark, also, and because no ruling was made or reprimand awarded, another exception was added to the series. During the trial it had been developed by the testimony that Bill Taylor and Gus Meeks had been jointly indicted for a criminal offense in Sullivan county; that Meeks had pleaded guilty and been sent to the penitentiary in consequence of this, but had been pardoned out by the governor in order that Meeks might testify as a witness against Bill Taylor in that case, and that both Bill and George Taylor knew of these things, and they had made threats against Meeks. The theory of the state was that these facts furnished a motive for the perpetration of the crime for which defendants were indicted. It was therefore entirely legitimate and proper for Mr. Holliday to speak as he did, and the trial court was right in refusing to censure him.

e. In the fifth place, the remarks of Mr. Bresnehen were these: "The very harrow tracks belie the story. You can not warp or bribe a harrow track. You can not influence the harrow and wagon tracks by a Col. Myers or by a letter from Bill Taylor." Defendants' counsel objected, saying, "It is an unneces-

sary reflection on Col. Myers. There ought not be any insinuations of that kind. It is only done to prejudice the jury and I object to it." *The court:* "It is out of order, counsel will avoid vituperation." A statement is made in the motion for a new trial to the effect that Col. Myers was one of defendants' counsel, and that the remark of state's counsel was an insinuation against him, that he had been guilty of bribery or attempted bribery, etc. But as statements in motions for new trials do not prove themselves, as we have so often decided (*State v. Foster*, 115 Mo. 448; *State v. Jewell*, 90 Mo. 467; *State v. Musick*, 101 Mo. 260; *State v. Welsor*, 21 S. W. Rep. 443; s. c., 117 Mo. 570; *State v. McDaniel*, 94 Mo. 301; *State v. Bosler*, 119 Mo. 417), and as Col. Myers' name does not appear in this record as counsel for defendants, we will not *assume* that he was. If he was *not* one of defendants' counsel, it is difficult to see how defendants could have been prejudiced by the remark. Moreover, if the testimony of Mrs. McPhetridge is to be taken as true, the remarks of Mr. Bresnehen were within the legitimate line of argument. And at any rate the reprimand of the court, even if deserved, was equal to the transgression.

12. The alleged misconduct of the jury will next receive attention.

*a.* The jury while passing in the charge of a deputy sheriff from the court room down street to their room, were permitted to stop and *to be photographed.* We make no ruling on this point; it is unnecessary.

*b.* At one time one of the jury sent for twenty-five cents worth of beer, crackers, and bologna sausage. There was not more than half a gallon of the beer, and it was consumed by five or six of the jurors. Inasmuch as no proof was offered that the jurors thus partaking of the beer became intoxicated by it, and in the absence of such proof nothing occurred which would constitute

reversible error.  *State v. Baber*, 74 Mo. 292; *State v. West*, 69 Mo. 401; *State v. Upton*, 20 Mo. 398.

*c.* Nor does it appear what the habits of those jurors were.  If habitually accustomed to the use of beer, and the supply should be cut off, a man thus deprived of his customary stimulant, like one deprived of coffee or tobacco to which he is addicted, would, if the trial were a protracted one, in all probability fall into such a state of mental and physical depression and irritation as to seriously unfit him properly to discharge the duties of a juror.  2 Thompson, Tr., sec. 2567.

*d.*  But it is said the jury secured a deck of cards and played with each other.  Whether this occurred pending the trial, during a recess of court and before they were finally charged with the cause, does not appear.  If merely pending the trial, and before the cause was delivered to them for determination, it is not seen that a simple game of drafts or cards to relieve the tedium of a recess in the jury room should be regarded as a very serious affair.  Certainly not if indulged in with moderation.

*e.*  Relative to the alleged separation of the jurors and other alleged misconduct, the previous forming and expression of opinions by several of them, it is enough to say that the whole matter of this paragraph was examined by the lower court upon affidavits *pro* and *con* and that court having ruled that the verdict should stand, we will not interfere with such ruling unless upon grounds the most clear and reasons the most manifest. *State v. Howard*, 118 Mo. 136, and other cases cited under paragraph 2.

13.  The final point for determination is whether reversible error occurred by reason of the refusal of time to defendants to file affidavits in rebuttal of those filed by the state in rebuttal of those filed by defend-

VOL. 134 mo—11

State ex rel. v. Tittmann.

ants. The lower court was doubtless personally ac-. quainted with a large number of the affiants, and perhaps by reputation with all of them, and therefore had much greater advantages than have we for determin- ing whether additional time should be granted defendants in which to file further affidavits. With that discretion we are not disposed to interfere, and will not do so unless an abuse of discretion were shown. 2 Elliott's Gen. Prac., sec. 564.

Having thus carefully considered all of the objections urged in behalf of defendants, and discovering no substantial error in the record, we affirm the judgment, and direct that the sentence pronounced be executed. GANTT, P. J., and BURGESS, J., concur, the latter, however, expressing no opinion as to the failure of the court to permit Mr. Painter to testify.