State v. Bronstine.

THE STATE v. BRONSTINE, Appellant.

Division Two, February 7, 1899.

1. **Indictment: DESCRIPTION OF WOUND.** It is not necessary in an indictment to describe the wound nor to state upon what particular part of the body it was inflicted.

2. **Juror: COMPETENCY: OPINION AS TO DEFENDANT'S GUILT.** A juror stated that he had a conditional opinion, yet his evidence on his *voir dire* clearly demonstrated that he had not conversed with any witness or with any person who claimed to know the facts, but that his impression was obtained from newspaper reports and public rumor, and was not such as to prevent him from returning a fair and impartial verdict. *Held* that the juror was not incompetent.

3. ——: ——: UNCHALLENGED. If no challenge is made of a juror at the time of his acceptance, defendant can not afterward complain of his incompetency.

4. **Insanity:** OPINION OF NON-EXPERT WITNESSES. Non-expert witnesses may give their opinions as to sanity or insanity of a person when they first disclose the facts on which their opinion is based.

5. ————: MURDER IN SECOND DEGREE. Where the only defense is defendant's insanity, and the evidence shows that the homicide was without provocation, and had been deliberately planned, no instruction for murder in the second degree should be given.

*Appeal from Clark Circuit Court.*—HON. E. R. McKEE, Judge.

AFFIRMED.

ELI W. GWYNNE, N. T. CHERRY, J. S. TALL and J. A. WHITESIDE for appellant.

(1) The indictment is bad and the judgment should have been arrested. A wound in the internal angle of the eye four inches deep, an impossible wound, is charged. And had such a wound been possible, it would not have been fatal. The proof shows the wound to be in the head—the ball lodging at the base of the brain. (2) While the court has held that non-expert witnesses may give an opinion as to the sanity of the defendant, they must have had favorable opportunities for ascertaining by observation as to his mental condition, and must first give the facts upon which the opinion is based. State v. Bryant, 93 Mo. 273; Sharp v. Railroad, 114 Mo. 94; Turner v. Railroad, 23 Mo. App. 19. (3) The court erred in refusing the twelfth instruction asked by defendant, instructing on murder in the second degree. The proof shows that defendant had a diseased mind from his boyhood, and in our judgment, shows that he was at times crazy. We think that prejudice against the defense of insanity led to defendant's conviction. But if he was not insane, the uncontradicted proof by witnesses for the State, as well as witnesses for the defendant, shows beyond question, that defendant was subject to spells, in which, without provocation, cause or warning, he would fly into a heat of passion.

State v. Bronstine.

EDWARD C. CROW, Attorney-General, SAM B. JEF-FRIES, Assistant Attorney-General, and W. W. GRAVES, for the State.

(1) The jurors challenged by the defendant were competent to sit in the case. R. S. 1889, sec. 4197; State v. Bryant, 93 Mo. 273; State v. Williamson, 106 Mo. 163; State v. Duffy, 124 Mo. 1. (2) The instructions given by the court completely cover every issue in the case and correctly state the law of the case. They are such as have been frequently approved by this court. (3) In this case the only defense interposed was that of insanity. The homicidal act stands admitted. The instructions have been bodily borrowed from previous decisions of this court in cases involving the same issues and have been so frequently approved by this court that citation of authority is unnecessary. Upon the question of the mental condition of defendant in this case, as in most cases, there is testimony both ways, but the great preponderance of the testimony does not tend to show the defendant insane. His acts afterwards does not indicate as much. In his judgment, self-defense was the proper thing, so he started out by telling that his wife had shot at him, and he then shot and killed her.

GANTT, P. J.—From a conviction of murder in the first degree defendant appeals to this court.

The homicide occurred in Clark county on the twelfth day of March, 1898. The indictment was returned at the April term, 1898. Defendant was duly arraigned. Being without means, the court appointed two members of the bar to represent the defendant. The cause was set down for trial on June 25, 1898. At that time a trial was had and defendant found guilty.

The facts are few and simple. The defendant was a married man. His wife had borne him six children, two of whom had died before the homicide occurred. He had become

so cruel in his treatment of his wife and children at times, that his wife left him and took her children to her mother's home. On the twelfth of March, 1898, he went to the home of her mother, and shot and killed his wife.

The facts are thus detailed by Mrs. Julia Rowe, the mother:

"I am 78 years old; I was at home on the 12th of March; there was no one there but me and her and the two little children, the biggest child was up at Henry's; when I say her, I mean Mrs. Bronstine; she was my daughter; her name was Amelia Jane, but she was generally called Dud, that was the nickname she always went by; I have seen Fred Bronstine; he came to my house on that day; he came there horseback; he came there but no one knew it; I guess he must have slipped up and then got off his horse; she went to the door, I did not go; I says: 'What's out there?' I says: 'Who is that, I don't know him?' 'Well,' she says, 'It's Fred.' I did not say nothing more, you know; he said he came to see the children; she said to come in, and he came in, but he did not come into the house, only came to the door; the children got there and it appeared like they did not want to see him; when one got up and went towards him, that was not what he came for, the child; no, sir, it was not; he says, 'Are you going to come back and live with me?' said this to Mrs. Bronstine. She said, 'No; I won't go back.' He jerked a revolver out of his pocket and pushed and jammed her against the door and shot at her and she knocked the revolver away, and he did not hit her. She ran into the room and he followed her and shot her there. She ran back, and he ran back to where she was standing and caught her with his left hand and jammed her against the facing of the door and drew up the gun and shot her in the eye. I did not know which eye it was. She slipped till she fell upon the ground; he saw she was going to die and said to me, 'Come help me take her in the house,' and then he laid her on the floor; she was dead then; he walked

around her and said to me, 'Do you think she is dead?' I said, 'My God, anybody would be dead.' He walked around and said 'I am going to kill myself, here is my pocketbook, take that money and keep it to bury me and Jennie.' He always called her Jennie. I took the pocketbook and laid it upon the safe. Then he says, 'Now I am going to kill myself.' I says, 'Just step out of doors if you are going to kill yourself.' I didn't want him in the house. He then would not kill himself; he walked around, and the little girl went up to Mr. Clark's, he was fixing something with his back to me, and directly the revolver shot, and the little girl said the bullet just passed her head; he shot four times at her in the door; once in the house, that made five times; the sixth time he went after the little girl; when he had Mrs. Bronstine against the door and shot her was the time he killed her; she was against the facing of the door and just slipped down; she never struggled; there was no signs of life after that. Two little ones and I were there when he shot down their mother. I was there when the doctor came; the doctor washed her face. Bronstine got on his horse and said he was going to Monticello to give himself up; he came back and got his pocketbook; he had gone pretty nigh a hundred yards and came back and asked me for his pocketbook. Mr. Clark came as soon as Fred got out of sight a little bit and stayed with me. Mrs. Bronstine and the children had been at my house nearly two months; before that she had lived with him. Bronstine and his wife lived at my house some years ago; they farmed my place; that has been several years ago. Sometimes he appeared to treat her well and again he was awful cross to her. We buried Mrs. Bronstine on the next day, Sunday, at Providence church."

*Cross-Examination.*

"They lived with me about three years ago; he tended two crops on my place; he was kind enough to his family

while there except at times; he was unkind to his children when he got mad at them." (Here counsel for the defendant showed by the witness that defendant would at times get mad at his wife and children apparently without cause, the witness calling these spells "mad or mean spells.") Concerning the murder, the witness then said: "The oldest girl was there when her mother was shot; this girl was standing in the room; the younger one, the one eight years old, was under the bed, I think; Mrs. Bronstine slipped and fell on the doorstep, down on the porch like, after the last shot. Bronstine was right on the doorstep, too, he pressed her right aganist the house, holding her with one hand and shooting her with the other; he had her against the door facing; I think he was a little lower than she as they stood there. There were four shots out of doors in all, and one in the other room, and one when he went out and saw the little girl going to Mr. Clark's; six shots altogether. I don't think I ever heard him say that he would kill her; when I spoke of threats, it was what his children and wife told me. At the time he would have those spells when he lived at my house I never saw him strike the children; just abuse them. I can't tell you about the revolver at all; he had it in his hand and drawed it up like this; it went right up against her, and shot her. I saw him load up after he shot; he went out doors and loaded up; he had his back to me; you know I just said he was loading; we looked for the shells, but couldn't find them; I think he put them in his pocket."

Birdie Lee Bronstine, a child of defendant, ten years old, testified:

"I am ten years old; I was down at grandma's the day mamma was killed; I was standing in the door; papa came there on his horse. He said, 'How do you do?' and I said, 'How do you do?' He told her to come and kiss him, and she would not do it; then he got off. I was going under the bed, and she told me to get out. Mamma was standing in the doorstep;

he asked her if she would come back and stay, and she said no; then he held her and shot, and she knocked off the lick; he shot her again; she knocked it off and ran in the house; he shot again, and then came back, and he caught her and shot her, and she fell.  She never did anything when she fell. And then I went up to Mr. Clark's; papa was standing there when I left; he shot her in the right eye; I went and got Mr. Clark's folks; I told them what had happened; I did not go back then.  The revolver was a bright one.  I never saw him shoot but three times.  He tried to shoot at mamma each time. Grandma and Nora and Allie and I were there.  Before we went to grandma's, we lived over across the creek.  I do not know what made us go over to grandma's.  Papa and mamma quarreled while we lived over there; they quarreled often; they never fought with one another; on the night before we left they quarreled; papa choked mamma that night; caught her around the throat and choked her; mamma was sitting on a chair by the eating stove; I saw them quarrel before that; papa would cuss and swear at mamma."  The cross-examination of this witness was along the line of showing that the husband would frequently take mad spells without any apparent cause; evidently for the purpose of sustaining a plea of insanity.  The witness states that when he was not mad he was good to their mother and children.

Dr. Thomin testified that he was called on March 12 and found Mrs. Bronstine dead at the home of her mother.  He testified that the bullet entered at the inside angle of the eye, went in between the eye ball and the nose and ranged directly into the head.  The ball did not go clear through the head, but lodged in the brain.  The wound was four and one half inches deep.  The entire wound was powder burnt around the edges.

There were no other wounds upon the body of deceased. The wound in the eye was mortal, and produced her death.

Charles Clark, junior, testified:

"I live in Clark county, Missouri; am the son of James Clark; I have not been at home this summer; I was at home last March; am acquainted with Fred Bronstine; I saw him on the 12th of March in front of James Stanforth's; he was going south on horseback tolerably fast; Guy Barrows was with me; I had a short talk with Bronstine; his face was bleeding, and Guy asked him what was the matter, and he said that he went down to see the children and Jennie shot him, and he said he just pulled a revolver and shot her and killed her, and Guy asked, 'Did you kill her?' and he said, 'Yes, I killed her.' I asked him what she shot him with, and he said the gun. I says, 'I do not think that will do, Fred,' and he says, 'It will have to do.' Guy says 'Why don't you have her arrested?' and he says, 'That is what I am going to do now.' Guy said, 'Let's all go together.' He rode on south and said he was going to Monticello. I suppose this was about four o'clock or half past. After that I went to Williamstown. Fred Bronstine has been to our house several times; he said very little about having trouble with his wife; he didn't seem to complain very much about her leaving, just wanted to know if she had talked about him; I told him no, that I had never heard her say anything about him."

Clarence Carlin testified:

"I live in this county; am acquainted with Fred Bronstine; I stayed at his house; was there about the first of March last; his house was south of Williamstown, about four miles on the Fabius; there were no women folks there; his wife was not there; I worked with Fred chopping in the timber; he and I lived in the house; I did the cooking; Fred got a revolver of me while I was there; it was a 38 caliber, center fire, British bulldog; it was an oldfashioned one; I don't know whether he just borrowed it of me or took it; I had borrowed it from a party and had been wanting cartridges for it and could not get them in town; they had none at Bunker Hill; Bronstine

wanted to take it with him and get the cartridges; I told him he need not take it because it was not used; it was a 38 center fire, and he could not get those cartridges; he borrowed a coat and vest of me.   I was at Bronstine's on March 11, Friday; I was there from 1 o'clock in the evening on; I did not do any work; I cut my hair and shaved; I had a revolver at that time and Fred knew it; I kept it in a stand drawer; I saw him with it that night; he was trying it in his pockets; he had a coat and vest of mine on and was trying the revolver in the pockets; Fred went to Bunker Hill the next day, he told me; he was cursing and said he could not get them large enough; he took the revolver with him; the next I saw of Fred was yesterday."

### Cross-Examination.

"I told him to take the gun and to get the cartridges; that's the way he come to take the gun."

T. W. Burford testified:

"On March 12th last I lived at Bunker Hill, Lewis county, Missouri; am acquainted with Fred Bronstine and have been for about five years; I am in the general merchandise business; Bronstine traded with me; I saw Bronstine about the 12th of March; he came to my store along about half past eight or nine o'clock and stayed till eleven o'clock; he bought some cheese and crackers and left about half past eleven; he went towards Williamstown; he came back again in the evening after the shooting occurred; I was out in the lot busy weighing hogs; he came to the fence and hollered to me to come out; I was busy and hesitated at first, but he insisted so that I went out towards the fence so I was close to him; I asked him what was the matter with his face; it seemed to be all muddy; I took it to be mud at first, I did not notice very close; he said, 'That's where my wife shot me,' and pushed his hat back; I said, 'What were you doing?' He said, 'I went over to see the children and she shot at me

and I shot and killed her.' A week or two before this Bron-
stine said that there was a rumor around that he had choked
his wife, but he said that it was just the other way, that she
had choked him."

On cross-examination the witness said: That in this
second conversation mentioned above, the defendant talked
about his family troubles, and seemed to be in a great deal
of trouble, and that at times he cried and appeared to be
flighty; that he would jump from one subject to another;
very little sense in his conversation; that at the time of the
first conversation the defendant showed him the cylinder of a
revolver, and wanted cartridges to fit it; I had the size cart-
ridges he wanted, but would not let him have them; I knew
the circumstances; I thought best not to sell him the cart-
ridges; he was there three hours or better; I never noticed
anything peculiar about him until this first conversation men-
tioned; he told me that he kept the gun loaded, and that he
expected to have trouble or thought of having trouble.

Other witnesses corroborated the State's case.

The defense consisted of evidence that defendant bore
a general reputation of being a peaceable, law-abiding citizen.
This was shown by a score or more of witnesses who had
known him for many years. These same witnesses testified
to many peculiar actions on the part of defendant. It was
shown that on one occasion he had rented land, prepared it
for a crop, planted it and after it was about mature, he sud-
denly insisted on selling it for a price far below its real value.
At another time he sold his crop after it had reached a fair
size for seventy-five cents.

Many of the witnesses testified that he was subject to
stubborn, passionate spells. These spells grew more and more
frequent as he grew older. He was pleasant and kind to his
family between spells, but would curse and abuse them when
under them. He would have these spells without the slightest

provocation.    He would curse and break up the furniture and frighten his wife and children with threats to kill them.

Physicians testified his symptoms indicated epilepsy.  His brother William testified that defendant did not attend the funeral of either his father or mother, although sent for. His two children died and he failed to let his brother or sister know of their deaths, although on good terms with them.

Witnesses described his appearance as something frightful when he was in one of his spells.

On the other hand a number of witnesses in rebuttal testified they knew him well and considered him sane.   Heard him swear at his family without any cause but didn't think he was insane.

I.   The only point made on the record proper is upon the indictment.   Counsel insist that the allegation as to the wound charges an impossible wound.

The averment is that defendant "with the leaden balls aforesaid" gave the deceased "in and upon the internal angle of the right eye of her the said Amelia Jane Bronstine one mortal wound of the breadth of one half inch and the depth of four inches, of which said mortal wound the said Amelia Jane Bronstine *then* and *there* instantly died."

The point must be ruled against the defendant.   It has been frequently held by this court that it is not necessary to describe the wound or state upon what particular part of the body it was inflicted.  [State v. Arnewine, 126 Mo. 567; State v. Edmundson, 64 Mo. 398; State v. Sanders, 76 Mo. 35; State v. Green, 111 Mo. 585.]

II.   The competency of F. M. Thompson and J. A. Porter as jurors is made a ground of error.

Thompson was a competent juror.   While he stated that he had a conditional opinion, his evidence on his *voir dire* clearly demonstrated that he had not conversed with any witness in the case or any person who claimed to know the facts. His impression was obtained from newspaper reports and

public rumors, and was not such as to prevent his returning a fair and impartial verdict. While the record also shows Porter to have been competent, it could not avail defendant if otherwise, because no challenge of this juror was made at the time of his acceptance by the court. [State v. Hopkirk, 84 Mo. 278; State v. Taylor, 134 Mo. 109.]

III. The court over the objection of defendant's counsel permitted several witnesses for the State to testify that they had known defendant for a number of years; were his near neighbors; visited with him; saw him frequently and observed his manner of acting, and his conversation and saw nothing peculiar or strange in his conduct and that in their opinion formed from this association and intercourse he was sane at and just before the homicide.

There was no error in this action of the court. Nonexpert witnesses may give their opinion as to the sanity or insanity of a person when they first disclose the facts upon which their opinion is based.

Having lived in the immediate neighborhood for many years, conversed with and visited defendant often, it was competent for them to state first their opportunity of observing him and then that they noticed nothing peculiar or strange in his speech or conduct and that in their opinion he was not insane. [State v. Bryant, 93 Mo. loc. cit. 299.]

IV. We have considered the instructions carefully and find that they comply with the decisions of this court on every question raised in the record. No more favorable instructions could have been lawfully given in behalf of defendant.

His counsel presented his defense of insanity in every conceivable way to obtain a favorable finding by the jury.

V. It remains only to add that the circuit court very properly refused to give instruction for murder in the second degree. If the defendant was not insane when he shot his wife, he was guilty of a cold blooded deliberate murder. He prepared the murderous weapon the night before and under

pretense of visiting his children went to the home of his wife's mother.

By no act or word of hers was any provocation given him which would reduce his act of killing from murder in the first degree to the second degree. If he was sane, it was a brutal, cowardly act, without a redeeming feature in it. If he was insane he has committed no crime and is entitled to the pity and sympathy of all men.

There is some evidence tending to prove he was insane, but there was also in addition to the presumption of sanity, much additional evidence that he was not insane but knew the right from the wrong of his terrible deed.

The jury who heard and saw the witnesses under the most favorable direction in his behalf, have found him sane and guilty. The trial judge, who also had opportunity to observe and note the witnesses, has approved the verdict. Under these circumstances it is our duty to affirm the judgment, and it is accordingly so ordered, and it is adjudged that the sentence of the law be executed. SHERWOOD and BURGESS, JJ., concur.